**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| FREDERICK S. LEACH, M.D., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-0921 |
| | § | |
| BAYLOR COLLEGE OF MEDICINE, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Frederick Leach, M.D., Ph.D., sued his former employer, the Baylor College of Medicine ("Baylor").  Dr. Leach, who is African-American, alleges that Baylor discriminated against him by terminating his employment and subjecting him to a racially hostile work environment.  He also alleges that Baylor retaliated against him for filing an EEO discrimination charge by changing various terms of his employment at the Michael E. DeBakey VA Medical Center, an affiliated teaching hospital for Baylor.  Dr. Leach also alleges that Baylor tortiously interfered with his employment contract at the VA.  Dr. Leach asserts claims for discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and for tortious interference with contract under Texas common law.

Baylor has moved for summary judgment on all claims.  (Docket Entry No. 38).  Dr. Leach responded, (Docket Entry No. 39), filed a supplemental response, (Docket Entry No. 40), and Baylor replied, (Docket Entry No. 42).

Based on a careful review of the pleadings, the motion, response, and reply, the record, and the applicable law, this court grants Baylor's motion for summary judgment.  The reasons for this ruling are set out in detail below.

## I.        The Summary Judgment Evidence[1]

### A.        Dr. Leach's Employment at Baylor

The summary judgment evidence shows that on July 15, 2002, Dr. Leach accepted a tenure-track appointment as an Assistant Professor in the Baylor Urology Department.  (Docket Entry No. 39, Ex. 2).   The appointment term was from August 1, 2002 through June 30, 2003, but

---

[1]The summary judgment evidence in the record includes the offer letter from Dr. Boone to Dr. Leach,  (Docket Entry No. 39, Ex. 1); a March 11, 2004 letter from Dr. Lerner to Dr. Leach, (*id*., Ex. 32); Dr. Leach's e-mail correspondence with Dr. Boone about his disagreement with Dr. Lerner over lab space, (Docket Entry No. 39, Ex. 31); Dr. Leach's termination letter, (*id*., Ex. 38); Dr. Boone's December 18, 2008 affidavit, (Docket Entry No. 38, Ex. C); Dr. Leach's curriculum vitae, (Docket Entry No. 39, Ex. 20); Dr. Leach's July 18, 2005 Texas Commission on Human Rights Intake Questionnaire, (*id*., Ex. 36); Dr. Leach's November 7, 2005 Texas Workforce Commission Charge of Discrimination, (*id*., Ex. 46); documents relating to the hiring of Dr. Link, (Docket Entry No. 38, Ex. B, Mandzuk Affidavit, Exs. 25-27); the fall 2005 correspondence between Dr. Leach's attorney and Baylor's general counsel about Dr. Leach's clinical transition, (*id.*, Exs. 20-23); a September 14, 2005 letter from Dr. Leach to Dr. Griffith about the proposed tour of duty change, (Docket Entry No. 39, Ex. 64); the Affiliation Agreement between Baylor and the VA Medical Center, (Docket Entry No. 38, Ex. A, Leach Deposition, Ex. 31); the November 1, 2005 letter from Baylor to Dr. Berger informing the VA that Dr. Leach was no longer on the Baylor faculty, (Docket Entry No. 39, Ex. 59); the November 2005 correspondence between Dr. Berger and Dr. Leach, (*id*., Exs. 49, 60, 65); the January 30, 2006 performance review, (*id*., Ex. 70); the February 2006 correspondence among Baylor, Dr. Berger, Dr. Griffith, and Dr. Leach about Dr. Leach's tour of duty and supervision of residents, (*id*., Ex. 82); the March 2006 correspondence among Dr. Berger, Dr. Griffith, and Dr. Leach about Dr. Leach's tour of duty and new responsibilities at the VA, (*id*., Exs. 84, 85); the April 18, 2006 "Review and Expectations" from Dr. Berger to Dr. Leach, (Docket Entry No. 38, Ex. D, Leach Deposition, Ex. 41); Dr. Leach's April 21, 2006 response to Dr. Berger, (Docket Entry No. 39, Ex. 104); the August 7, 2006 written counseling memorandum, (*id*., Ex. 94); Dr. Leach's response to the August 2006 written counseling, (*id*., Ex. 95); Dr. Leach's EEO Affidavit dated September 18, 2006, (*id*., Ex. 48); Dr. Leach's January 19, 2007 performance evaluation, (*id*., Ex. 53); Dr. Leach's January 29, 2007 termination letter from the VA, (*id*., Ex. 54); Dr. Griffith's EEO Affidavit, (Docket Entry No. 38, Ex. F); Dr. Berger's EEO Affidavit, (*id*., Ex. E); and Dr. Leach's deposition transcript, (*id*., Exs. A, D).

reappointment was subject to review at the end of each academic year.  (*Id.*).  Dr. Timothy Boone, Chairman of the Urology Department, interviewed Dr. Leach and offered him the position.  Dr. Boone believed that Dr. Leach was "an exciting young investigator" with outstanding credentials and both research and clinical expertise in bladder cancer.  (Docket Entry No. 39, Ex. 1).  Dr. Boone told Baylor's Dean and Executive Vice-President, Bobby R. Alford, that he had "great hopes that [Dr. Leach] will further strengthen our bladder cancer program."  (Docket Entry No. 39, Ex. 1). Shortly after accepting the Urology Department appointment, Dr. Leach accepted a joint appointment from Dr. Arthur Beaudet as an Assistant Professor (on tenure track) in Baylor's Molecular and Human Genetics Department.  (Docket Entry No. 39, Ex. 3).

Dr. Boone offered Dr. Leach three years of salary support from Baylor at $225,000 per year and an initial $100,000 in seed money for research.  (Docket Entry No. 39, Ex. 105).  Dr. Boone assured Dr. Leach that he would have at least 1,000 square feet of laboratory space for his research. (*Id.*).  The offer letter stated that within three years, Dr. Leach would "transition" from this salary support to a faculty practice plan under which his salary would be the net income from his own practice.  (*Id.*).  Dr. Boone also stated in the offer letter the expectation that Dr. Leach's "research [would] be self-sustaining after year 3."  (*Id.*).  Dr. Boone was Dr. Leach's direct supervisor during his employment at Baylor.

As a Baylor faculty member, Dr. Leach assumed a part-time staff position at the VA Medical Center.  The VA serves as a teaching hospital for Baylor.  (Docket Entry No. 38, Ex. A, Leach Deposition, Ex. 31).  Baylor and the VA Medical Center had signed an Affiliation Agreement in 2002.  (There was a prior affiliation agreement signed in 1997.)  The Agreement authorizes the VA to affiliate with Baylor for the academic purposes of enhancing patient care, education, and research.

3

Under the Affiliation Agreement, Baylor has the primary responsibility for education programs conducted with the VA, and the VA retains responsibility for patient care. The Agreement states that "VA staff members who are also [Baylor] faculty members are responsible for student and house staff supervision for educational purposes but may delegate responsibility to non-faculty VA staff under unusual circumstances." (*Id.*). The Agreement also states that "[n]othing in this agreement grants to [Baylor] any legal authority to exercise control over any VA program or facility. Ultimate responsibility for the control and operation of the VA facilities and programs rests with the VA." (*Id.*).

Dr. Boone's offer letter to Dr. Leach stated that "[a]long with your laboratory effort, I think my main focus for your initial time would be to get the VA clinic in top shape." (Docket Entry No. 39, Ex. 105). Dr. Leach's supervisor at the VA Medical Center was Dr. Donald Griffith, Chief of Neurology Service. Dr. Griffith was also a Professor of Neurology at Baylor. Dr. Boone, in addition to being Chairman of the Baylor Urology Department, was a part-time staff urologist in the VA's spinal cord injury unit. His supervisor at the VA was also Dr. Griffith. Dr. Griffith's supervisor at the VA was Dr. David Berger, the Operative Care Line Executive.

Baylor has an Equal Employment Opportunity Policy and an Anti-Harassment policy. (Docket Entry No. 38, Ex. B, Mandzuk Affidavit at ¶ 4). Baylor also has grievance procedures that apply to both tenured and nontenured faculty. Dr. Leach signed a form acknowledging that he had access to Baylor's policies and procedures on Baylor's Intranet. (Docket Entry No. 38, Ex. A, Leach Deposition, Ex. 7). Baylor's grievance procedure states that at an aggrieved faculty member's request, Employee Relations will explain the grievance procedure and offer assistance in completing the forms and preparing submissions. (Docket Entry No. 38, Ex. B, Mandzuk Affidavit at ¶ 4).

4

Baylor asserts that Dr. Boone supported Dr. Leach's endeavors for funding and awards. Dr. Boone endorsed Dr. Leach for the 2003 Searle Scholars Program, the 2003 Pew Scholarship, and the 2003 Damon Runyon Scholarship. Dr. Boone recommended Dr. Leach for membership in the Texas Urological Society and for the Junior Faculty Seed Funding Program. (Docket Entry No. 38, Ex. C, Boone Affidavit, Exs. 3-7). Dr. Leach testified that the Searle, Pew, and Damon Runyon grants are highly competitive. Baylor selected Dr. Leach as one of only "two or three junior faculty [members to] compete in a national competition for grants." (Docket Entry No. 38, Ex. A., Leach Deposition at 132:10-21). Dr. Leach was unaware of any other Urology Department faculty member nominated for the Searle, Pew, Damon Runyon, or Junior Faculty Seed Funding awards while he was at Baylor. (*Id.*, at 135:4-136:11).

Evidence in the record shows that Dr. Boone nominated Dr. Leach to the Faculty Awards Committee for the Searle, Pew, and Damon Runyon awards. On July 17, 2002, Dr. Boone wrote Dr. David P. Huston, Chair of the Faculty Awards Committee, to "strongly endorse" Dr. Leach's nomination for the Searle Scholarship. (Docket Entry No. 38, Ex. A, Leach Deposition, Ex. 9). On August 29, 2002, Dr. Boone nominated Dr. Leach for the Pew Scholars Program. (*Id.*, Ex. 10). On October 3, 2002, Dr. Huston informed Dr. Boone that the Committee had chosen Dr. Leach to represent Baylor. (Docket Entry No. 39, Ex. 23). Dr. Boone passed this letter on to Dr. Leach with a hand-written note stating: "Congrats! We'll see how it goes and let me know how we can help." (*Id.*). On April 14, 2003, Dr. Boone nominated Dr. Leach for the Damon Runyon Scholar Award. (Docket Entry No. 38, Ex. A, Leach Deposition, Ex. 12). On May 13, 2003, Dr. Huston told Dr. Boone that the Faculty Awards Committee had chosen Dr. Leach to represent Baylor for the Damon Runyon Award. (Docket Entry No. 39, Ex. 26).

Dr. Leach disputes that Dr. Boone supported his efforts to obtain funding and awards.  Dr. Leach testified in his deposition that the nominations he received came from Baylor's Faculty Awards Committee or from other faculty members.  (Docket Entry No. 38. Ex. A, Leach Deposition at 95:10-15;133:5-15).  Dr. Leach testified that Dr. Beaudet, not Dr. Boone, nominated him for the Searle Scholarship.  (*Id.*, at 88:25-89:17).  Dr. Leach testified that "a letter [from Dr. Boone] does not get you anything" and that Dr. Boone did not "go to bat" for him or support him to receive the awards.  (*Id.*, at 91:1-5; 134:4-13).  Dr. Leach acknowledges that Dr. Boone signed letters nominating him for these awards.  Dr. Leach asserts that Dr. Boone did not write the letters but merely signed letters others prepared for him as Department Chair.  Dr. Leach was not selected for the Searle Scholars Program or the Junior Faculty Seed Funding Program and did not receive the Pew or Damon Runyon scholarships.

In June 2003, Dr. Boone asked Dr. Leach for an update on the status of his lab work and grant applications.  (Docket Entry No. 39, Ex. 34).  Dr. Leach responded that he had "struck out for one reason or another on every attempt at funding.  The labwork goes very slowly and we are just getting equipment that Moon asked for months ago.  More equipment is needed . . . before we can even begin to make any strides."  (*Id.*).  Dr. Boone replied that Dr. Leach should come to him if he had problems with obtaining equipment because he did not "want things like that to slow [Dr. Leach] down."  (*Id.*).  Dr. Boone offered to "help get things jump started" for Dr. Leach.  (*Id.*).

In February 2004, Dr. Leach e-mailed Dr. Boone about a problem with laboratory space.  (Docket Entry No. 39, Ex. 35).  Dr. Leach described it as an "ongoing problem" with Dr. Seth Lerner, a senior faculty member in the Urology Department, over lab space for Dr. Lerner's "tissue engineering" research.  Dr. Leach told Dr. Boone in the e-mail that he had talked to Dr. Lerner about

6

it and wanted Dr. Boone's help sorting out who should be in the lab.  (*Id.*).  On February 25, 2004, Dr. Lerner e-mailed Dr. Boone asking him for a tissue engineering "room" and to consider reconfiguring the existing allocation of lab space.  (*Id.*).

On March 11, 2004, Dr. Leach and Dr. Lerner had a verbal disagreement about lab space. (Docket Entry No. 38, Ex. A, Leach Deposition, Ex. 15).  According to Dr. Lerner, Dr. Leach was "in [his] face, yelling at [him], pointing [his] finger at [him]" and then he "stormed out of there and slammed the door."  (*Id.*).  Dr. Lerner wrote Dr. Leach a letter  stating that he had felt physically threatened and requesting an apology.  (*Id.*).  Dr. Lerner's fellows informed him that Dr. Leach had "behaved in a similar manner to them."  (*Id.*).  Dr. Lerner told Dr. Leach that he "obviously [had] some very serious issues with [his] job" that he needed to resolve with Dr. Boone.  Dr. Lerner said that when Dr. Leach was "prepared to talk in a more civil tone," he would discuss any issues related to lab space.  (*Id.*).  Dr. Leach denies Dr. Lerner's account of the exchange.  Dr. Leach testified in his deposition that they had "an intellectual adversarial conversation in which [Dr. Leach] said, 'You are wrong to take over my lab space.'"  (Docket Entry No. 38, Ex. A, Leach Deposition at 139:25-140:2).

Dr. Boone offered to mediate the conflict between Dr. Leach and Dr. Lerner.  (Docket Entry No. 39, Ex. 31).  Dr. Leach responded that a meeting with Dr. Boone and Dr. Lerner would be "extremely counter-productive" because it would only "add fuel to the fire and create tension not relieve it."  (*Id.*).  Dr. Leach told Dr. Boone that Dr. Lerner "has a tendency to exaggerate" and asked that Dr. Lerner stay away from him and his laboratory program.  (Docket Entry No. 38, Ex. A, Leach Deposition, Ex. 17).  Dr. Leach reminded Dr. Boone that he was promised lab space when he was recruited to Baylor.  Dr. Leach said that he had been "making due" (sic) with a "fraction of

the lab space promised" and asked that the lab space he occupied stay "under [his] control."  (*Id.*).

Dr. Leach believed that he was entitled to the space he occupied and felt it was dishonest to write

grants stating that he had a certain amount of lab space when he did not.  (*Id.*).

Dr. Boone responded that Dr. Leach was promised 1,000 square feet and that the "back lab

is much more than that."  Dr. Boone told Dr. Leach that because he recruited him to become a

productive clinician and researcher,  he would "not disturb the back lab."  (*Id.*).  Dr. Boone agreed

that Dr. Leach needed "the space to go forward" and told him that he and even Dr. Lerner wanted

him to succeed.  Dr. Boone offered to talk with Dr. Leach about the lab space "any time."  (*Id.*).  But

Dr. Boone reminded Dr. Leach that the lab space did not belong to any particular doctor because

"Baylor has full rights to all of it . . . and can reclaim, reassign, or do what they want."  (*Id.*).  Dr.

Boone asked Dr. Leach "to diffuse the emotion some when you are dealing with people like Seth."

Dr. Boone added: "[t]here are many others around that you will conflict with over time and I don't

want you to get labelled [sic] as a hot-head, watch out for him, etc. Just my advice as a friend."

(Docket Entry No. 38, Ex. A, Leach Deposition, Ex. 17).  Dr. Boone and Dr. Leach met in April

2004 and resolved the laboratory space issue at that time.

Dr. Leach alleges that in late 2004 or early 2005, Dr. Boone made a racially discriminatory

comment.  Dr. Leach's EEOC/TCHR intake questionnaire dated July 18, 2005 states that Dr. Boone

told him that "private hospitals within the Texas Medical Center are unlikely to offer salary

guarantees in the form of endowed chairs to 'black boys unless they are able to do a Michael

Jackson type transformation.'"  (Docket Entry No. 39, Ex. 36).  In his formal EEO charge, dated

November 7, 2005, Dr. Leach paraphrased the comment as "black boys (not receiving salary

guarantees from private hospitals) unless they are able to do a Michael Jackson type transformation."

(Docket Entry No. 39, Ex. 46).  Dr. Leach testified that he understood Dr. Boone's comment to mean that "black boys do not get tenured" at Baylor or that "unless you can make yourself white, you don't be expecting any sort of salary guarantee from any sort of private hospital."  (Docket Entry No. 38, Ex. A, Leach Deposition at 156:19-157:3; 171:21-23).  Dr. Leach believes that Dr. Boone made this comment in late 2004 or early 2005 because it was "around the time when Baylor College of Medicine were giving other faculty members endowed chairs."  (*Id.*, at 166:8-16).  Dr. Leach testified that it was when "we were getting close to the time where I would be basically on . . . my own as far as no salary guarantees."  That was when "we were sort of considering, 'Okay. What's going to happen when the three years is up?'"  (*Id.*, at 166:22-167:3).

Dr. Leach also alleges that in early 2005, he heard that senior Baylor faculty members had said that he would be "let go," that he "won't survive," that he would be "killed off," and that he would be "encouraged" to join Dr. Ron Morton – another African-American faculty member who had recently left the Urology Department – in his practice.  (Docket Entry No. 4, at 2).  Dr. Morton called Dr. Leach and told him that Dr. Kevin Slawin, a faculty member in the Urology Department, had said that Dr. Leach would probably be fired from Baylor.  (Docket Entry No. 38, Ex. A, Leach Deposition at 173:8-12).

The record includes a March 1, 2005 e-mail from Dr. Slawin to Dr. Boone about laboratory space.  (Docket Entry No. 39, Ex. 30).  In the e-mail, Dr. Slawin said: "Despite the fact that Fred [Leach] may not be around here much longer anyway, one-half of the space in the room he is in was Ron Morton's which has now reverted back to the department. . . ."  (*Id.*).  Dr. Michael Lieberman, a former Baylor faculty member, told Dr. Leach in the spring of 2005 that he had heard from senior faculty members at Baylor that Dr. Leach was going to be fired.  Dr. Lieberman said that he did not

want to see Dr. Leach get "killed off" and have his academic career ruined.  (Docket Entry No. 38, Ex. A, Leach Deposition at 174:23-175:5).  In his deposition, Dr. Leach testified that he did not know the identity of the senior faculty members Dr. Lieberman had referred to, but that his "suspicions were that it was Seth Lerner, Tim Boone."  (*Id.*, at 177:16-25).

On January 18, 2005, Bradley Stees of the Urology Department had reminded Dr. Leach that he was scheduled to "transition" from a salary plan to a faculty practice plan beginning July 1, 2005.  (*Id.*, Ex. 20).  Stees informed Dr. Leach that Baylor would be reviewing his work product "since [he] was about to complete [his] initial three-year contract."  (*Id.*).  Stees asked Dr. Leach to submit to Baylor by February 4, 2005: (1) all publications accepted for publication in the last three years; (2) all major grants submitted for the last three years; (3) all grants (major or minor) awarded for the last three years; (4) accomplishments/detailed accounting of how the $350,000 Wilson Fund money was spent; (5) a research plan for the next year if a one-year contract extension were granted; and (6) a clinical plan for the next year if a one-year contract extension were granted.  (*Id.*).

In response, Dr. Leach provided Baylor with a copy of his curriculum vitae.  Baylor asserts that Dr. Leach "refused" to provide Baylor with his publications.  Dr. Leach testified that it is common practice to submit a curriculum vitae when asked for information about publications and grants.

Dr. Leach's curriculum vitae showed that for his research, *Proteolysis Components as Biomakers for Prostate Cancer*, he received approximately $70,000 of the Prostate Specialized Program of Research Excellence ("SPORE") grant from the National Institute of Health.  Dr. Leach testified that he submitted two additional grant applications between 2002 and 2005.  (Docket Entry No. 38, Ex. A, Leach Deposition at 199-200).  The $70,000 portion of the SPORE grant was the only

grant money Dr. Leach received while employed at Baylor. (*Id.*). Dr. Leach's curriculum vitae also showed that from 2002 to 2005, he published two book chapters, six reviews and invited articles, and eleven peer-reviewed publications. (Docket Entry No. 39, Ex. 20). Baylor asserts that several of these articles were written and submitted for review before Dr. Leach accepted his appointment at Baylor. Dr. Leach asserts that these articles were responsive to the January 2005 request for all publications accepted for publication in the last three years. In response to the request for information on how the money from the Wilson Fund was spent, Dr. Leach referred Stees to the Accounting Department. (Docket Entry No. 38, Ex. A, Leach Deposition at 184-85). Dr. Leach testified that because he did not have the information on how the Wilson Fund money was spent, he referred Stees to the entity in the best position to provide that information. (*Id.*, at 201:4-25). Dr. Leach testified that the "research plan" he submitted to Stees was "all the grants that had been submitted" because "[a] research plan is to get grants." (*Id.*, at 202:2-15). Dr. Leach does not recall whether he provided Baylor with the one-year clinical plan, as requested. (*Id.*, at 202:18-25).

In a letter dated July 6, 2005, Dr. Boone informed Dr. Leach that "[a]fter much reflection and review of your agreement letter and your three years with the [Urology Department]," his contract with Baylor would not be renewed. (Docket Entry No. 39, Ex. 38). Dr. Boone asserts that he made this decision based on Dr. Leach's refusal to provide the Urology Department with the requested information about his publications, grants, and accomplishments and on his conclusion that Dr. Leach had not met Baylor's expectations for funding or publications. (Docket Entry No. 38, Ex. B, Boone Affidavit at ¶ 12).

Baylor submitted as part of the summary judgment evidence a chart comparing the grants and publications of Dr. Leach and of Dr. Chris Smith, another Assistant Professor in the Urology

Department whose Baylor contract was renewed in 2005, when Dr. Leach's was not. (Docket Entry No. 38, Ex. B, Affidavit of Michael Mandzuk, Ex. 16). The chart shows that Dr. Leach had five peer-reviewed journal articles published between August 2002 and July 2005 and received $70,000 in grant funding. (*Id.*). The chart shows that Dr. Smith published seventeen peer-reviewed journal articles and received approximately $2,356,729 in grants between July 2002 and July 2005. (*Id.*). Dr. Leach asserts that Dr. Boone included Dr. Smith as a coauthor on eight publications to bolster Dr. Smith's curriculum vitae.

Dr. Leach responded to Dr. Boone by e-mail on July 7, 2005, stating that he was surprised and disappointed to have received the news of the contract nonrenewal in a letter. (Docket Entry No. 39, Ex. 40). Dr. Leach felt that Dr. Boone's decision was "a bit arbitrary" in light of the 2002 offer letter and his subsequent performance at Baylor. (*Id.*). After receiving the termination letter, Dr. Leach consulted a lawyer, who told him to file a complaint with the Human Resources Department. On July 14, 2005, Dr. Leach told Baylor HR that he had an EEOC or Title VII complaint against Baylor. (Docket Entry No. 38, Ex. A, Leach Deposition at 208). On July 22, 2005, Dr. Leach filed an EEOC complaint, alleging that Baylor terminated his contract because of his race. On August 22, 2005, Dr. Leach's lawyer informed Baylor that an EEOC complaint had been filed. (Docket Entry No. 39, Ex. 61).

Dr. Leach alleges that Baylor replaced him with Dr. Richard Link, who is Caucasian. Baylor argues that Dr. Link was not hired to replace Dr. Leach. In December 2004, Dr. Boone offered Dr. Link an appointment as an Associate Professor on tenure track in the Urology Department "with a special interest in minimally invasive surgery/endourology." (Docket Entry No. 38, Ex. B, Mandzuk Affidavit, Ex. 25). Dr. Link's appointment began on July 1, 2005. Dr. Link was appointed Director

of Baylor's Division of Minimally Invasive Surgery and Endourology, which was the focus of his

fellowship training.  In offering the position to Dr. Link in December 2004, Dr. Boone stated that

he believed Dr. Link had "the opportunity to develop the premier program in minimally invasive

surgery and endourology in the United States." (*Id.*).  Dr. Link did not assume a part-time position

at the VA Medical Center.  He had "public hospital duties" one day per week at the Ben Taub

General Hospital.  Dr. Link was to "help staff urology cases [at Ben Taub] and teach residents [his]

particular skills in minimally invasive surgery and endourology." (*Id.*).  Dr. Link received one-half

of his salary support from the Methodist Hospital during his first three years at Baylor.  (*Id.*, Ex. 26).

On August 19, 2005, Dr. Leach and his attorney spoke with Baylor's general counsel to

discuss Dr. Leach's transition to clinical practice.  (Docket Entry No. 38, Ex. A, Leach Deposition

at 217:16-18).  On August 29, 2005, Dr. Leach's attorney sent Baylor a list of suggestions for the

transition.  Dr. Leach requested a six-month transition period, asked Baylor to provide him with all

of his patients' information, and asked Baylor to provide his new contact information in response

to patients' inquiries and physician referrals for a two-year period after the transition.  On September

12, 2005, Baylor's general counsel responded by agreeing that Baylor would provide the information

to facilitate Dr. Leach's transition but proposed to end the transition period on October 31, 2005.

Baylor asked Dr. Leach to release his position at the VA because the Affiliation Agreement does

not permit physicians who are not Baylor faculty members to supervise medical residents at the VA

except under unusual circumstances.

Dr. Leach's attorney responded on September 29, 2005, requesting a transition period

through December 31, 2005 or three months from ratification of the transition agreement, whichever

was later.  Dr. Leach did not agree to leave the VA and requested that Baylor "not interfere with his

contract with the VA." (Docket Entry No. 38, Ex. B, Mandzuk Affidavit, Ex. 22).  Baylor's general

counsel responded on October 4, 2005, stating that they had reached an impasse and notifying Dr.

Leach that his last day with Baylor would be October 31, 2005.  (*Id.*, Ex. 23).

**B.      Dr. Leach's Continuing Employment at the VA Medical Center**

Dr. Griffith testified that before and after Dr. Leach left Baylor, he had an unusual tour of

duty – his working schedule – at the VA.  Dr. Leach worked at the VA on Saturday afternoons for

four hours, Sunday and Monday evenings for two hours each, and Tuesdays and Wednesdays from

5:30 a.m. to 7:30 p.m.  Dr. Leach was often not present during regular business hours when patients

were there for treatment.  Dr. Griffith assumed that this "unusual" schedule was due to Dr. Leach's

academic and research endeavors with Baylor.  In Spring 2005, Dr. Griffith sought to change Dr.

Leach's tour of duty at the VA so that he would be available on Thursdays to staff operations on

urology cancer patients.  (Docket Entry No. 39, Ex. 82).  Dr. Leach declined this request.  (*Id.*).

On September 13, 2005, Dr. Griffith e-mailed Dr. Boone a draft letter that was addressed to

Dr. Leach, changing his tour of duty at the VA.  Dr. Griffith explained to Dr. Boone that Dr. Leach's

tour of duty involved night and weekend hours, which he understood was "created to facilitate VA-

compensated 'academic time' wherein [Dr. Leach] could draft research proposals and intramural and

extramural funding proposals."  (*Id.*, Ex. 62).  Because Dr. Leach's contract with Baylor had not

been renewed, Dr. Griffith proposed to change Dr. Leach's tour of duty at the VA so that he would

work Monday through Friday during regular business hours.  Dr. Boone responded that he would

forward the draft letter to Baylor's general counsel for review, but stated that "[i]t looks good to me

otherwise."  (*Id.*).  After receiving approval from Baylor's general counsel, Dr. Boone told Dr.

Griffith to "go ahead and send it [to Dr. Leach] unless [Berger] or someone has a problem . . . I

doubt they will as they've wanted to get his time straightened out for some time now." (*Id.*, Ex. 63).

Dr. Griffith discussed the proposed change with Dr. Leach and gave him the letter on September 13, 2005.  The letter stated that Dr. Griffith no longer saw a need for "academic time" within Dr. Leach's VA duties.  The next day, September 14, Dr. Leach responded in writing, stating that he saw "very disturbing 'misperceptions' and misinformation that appear to be originating from communications between you and leadership positions inside and outside the [VA Medical Center]." (*Id.*, Ex. 64).  Dr. Leach asked for clarification of why there was no longer a need for "academic time" during his VA tour of duty.  He informed Dr. Griffith that his tour of duty had been fixed in March 2005 and that the proposed change would cause him to violate his approved tour of duty. (*Id.*).  Dr. Leach stated that his current tour of duty, post-Baylor, could be used for "increased participation" with the operating room schedule because he was available to participate in VA clinical activities 35 hours a week.    Dr. Griffith and Dr. Berger met with Dr. Leach to ask him to reconsider his night and weekend hours because his academic activities were "winding down."  They asked him to accept a "more normal tour of duty" and work between 7 a.m. and 5 p.m., when patients were at the VA.  Dr. Leach declined the request to change his tour of duty.  In this suit, Dr. Leach alleges that Baylor retaliated against him for filing the discrimination charge by seeking to change his tour of duty at the VA.

On November 1, 2005, the day after Dr. Leach's transition period ended, Dr. Boone formally notified Dr. Berger at the VA that Dr. Leach no longer held a faculty appointment at Baylor.  Dr. Boone sent the letter to "emphasize that [Baylor] policy clearly states that residents in the Baylor Urology Training Program should only be supervised and trained by Baylor faculty" and to "reinforce our concern that this policy is carried out to its fullest extent at the VA Medical Center."

(*Id.*, Ex. 59).  Dr. Boone stated that Baylor "believe[s] it would be damaging to the resident teaching program at the VA Hospital for procedures or surgical cases to be performed by a non-faculty staff practitioner, as this would deprive the residents of the educational experience of working with such cases at our affiliated institutions." (*Id.*).       On November 3, 2005, Dr. Berger notified Dr. Leach of Baylor's request.  Dr. Berger asked that Dr. Leach immediately stop supervising and teaching Baylor residents.  (*Id.*, Ex. 60).  Dr. Berger asked Dr. Leach to meet with him by November 8 to "work out a set of duties and schedule in order to meet the needs of the Urology Service under these constraints." (*Id.*).  Dr. Leach responded on November 8, 2005.  (*Id.*, Ex. 65).  He disagreed with Dr. Boone's "interpretation of the affiliation agreement and departmental policy regarding urology residency training" because he believed it was inconsistent with the bylaws and rules of the Medical Staff of the Department of Veterans Affairs.  (*Id.*).  Nonetheless, Dr. Leach stated that it "may be possible to comply with Dr. Boone's request."  Dr. Leach agreed that he would "to the best of [his] ability" not teach, train, or supervise Baylor Urology residents.  (*Id.*).  Dr. Leach stated that he would continue to "[e]ngage in the care of veterans at the [VA] consistent with [his] training and credentialing in urology, and in a manner consistent with the preamble of the bylaws and rules of the [VA Medical Center] regardless of involvement by house staff and/or Baylor College of Medicine faculty members." (*Id.*).

On November 29, 2005, Dr. Berger issued Dr. Leach a "directive" to address his tour of duty change and the residency supervision matter.  (Docket Entry No. 38, Ex. A, Leach Deposition, Ex. 33).  Dr. Berger told Dr. Leach that he was not to have contact with Baylor residents "in any training, instruction, or supervisory capacity" unless Dr. Griffith was directly involved.  (*Id.*).  Dr. Berger asked Dr. Griffith to develop a "working arrangement within the service that enables [Dr.

16

Leach's] continued effectiveness as a surgeon and clinician in providing excellent care to our patients." (*Id.*). Dr. Griffith tried to carve out an independent surgical and clinical service for Dr. Leach at the VA, but Dr. Michael Coburn, Director of the Urology Residency Training Program at Baylor, and Dr. Boone told Dr. Griffith that "creation of [an] independent surgical service is unacceptable to Baylor." (Docket Entry No. 39, Ex. 82).

Dr. Griffith developed a work plan for Dr. Leach that did not involve supervising Baylor residents. According to Dr. Griffith, the VA Urology Service could not "fully utilize Dr. Leach's current" 35 hour per week commitment. (*Id.*). Most clinical activities at the VA involved Baylor residents. Because Dr. Leach was no longer a Baylor faculty member and could not supervise those residents, Dr. Griffith concluded that Dr. Leach did not need 35 hours per week for administrative tasks and for clinical duties that did not include Baylor residents. Dr. Griffith asked Dr. Leach to use his time to develop a collection of clinical guidelines and patient educational materials, work that did not require supervising Baylor residents.

Dr. Griffith learned about Dr. Leach's EEO activity on January 24, 2006 when an EEO staff counselor contacted him. (Docket Entry No. 39, Ex. 78). The EEO complaint alleged that Dr. Griffith had changed Dr. Leach's tour of duty at the VA in retaliation for Dr. Leach's July 2005 EEO complaint against Baylor. Dr. Griffith told Dr. Berger and Dr. Boone about his conversation with the EEO staff counselor. (*Id.*). After the EEO complaint was filed, Dr. Horvath, the VA Chief of Staff, recused himself from all decisions about Dr. Leach to avoid a conflict of interest because Dr. Horvath's is Dr. Link's father-in-law. Dr. Horvath asked Dr. James W. Scheurich, Deputy Chief of Staff, to handle decisions about Dr. Leach's employment at the VA.

On February 8, 2006, Peter Traber, then President of Baylor College of Medicine, Dr.

17

Coburn, and Dr. Boone asked the VA to exclude Dr. Leach from clinical activities.  (*Id.*, Ex. 82).

They noted that the Residency Review Committee ("RRC") of the American Association of Medical

Colleges has strict requirements about who may participate in postgraduate surgical education.  (*Id.*).

The RRC requires that "the faculty of the responsible educational institution control and authorize

faculty involvement in postgraduate surgical education."   Medical schools with postgraduate

programs that do not meet this requirement are subject to sanction.  (*Id.*).  Although Baylor asked

that Dr. Leach be shielded from clinical activities, it expressed no opinion about Dr. Leach's

involvement in administrative or patient educational activities at the VA.

Dr. Griffith informed Dr. Berger and Dr. Horvath about Baylor's request that Dr. Leach "be

excluded from the on-going clinic activities of the urology service at [the VA Medical Center]."

(*Id.*, Ex. 83).  Dr. Griffith proposed changing Dr. Leach's tour of duty at the VA to "use Dr. Leach's

expertise" while complying with Baylor's request.   (*Id.*).   He recommended that the VA

"significantly alter [Dr. Leach's] tour of duty in favor of unmet medical, educational and

administrative needs."  (*Id.*).  These needs were listed in a "Staffing Situation and Performance

Review" written by Dr. Griffith and dated January 30, 2006.  (*Id.*, Ex. 70).  One of the needs Dr.

Griffith identified was managing "consult delinquencies."  VA hospitals receive written consult

requests from primary care doctors and other providers.  When the request is not answered – usually

because the patient did not show up for an appointment – it appears on a monthly consult

delinquency report.  Dr. Griffith asked Dr. Leach to handle roughly 50 to 100 consult delinquencies

per month, which meant either calling the patient to reschedule or canceling the consult request

because a review of the patient's medical chart did not show a major condition.  Dr. Griffith testified

that it would take about eight to ten hours per month to handle the consult delinquencies.  Dr.

Griffith also asked Dr. Leach to handle cancer-coding delinquencies, which Dr. Griffith testified would take about eight hours per month.  Dr. Griffith told Dr. Leach that the delinquencies were only part of his new responsibilities.  Dr. Griffith emphasized that he wanted Dr. Leach to use the remainder of his 140 hours per month at the VA Medical Center to develop the clinical guidelines and patient educational materials they had discussed in November 2005.

Dr. Leach alleges that he was not aware of the January 30, 2006 performance review until March 2006, when he discovered it on a shared network drive at the VA.  Dr. Griffith maintained drafts of his correspondence with Dr. Leach on a personal "jump drive."  (Docket Entry No. 39, Ex. 71A).  He had inadvertently saved some of these documents to a network drive that was available to members of the Urology Department.  (*Id.*).  Dr. Leach discovered these documents in the "Leach" file on the network drive on March 22, 2006, when a physician assistant made him aware of its existence.  (*Id.*, Ex. 71B).  Dr. Leach complained to Keith Neeley, Operative Care Line Administrator, that documents with sensitive personal information about him were available on the network.  (*Id.*).  Some of the documents in the "Leach" file were unfavorable performance reviews and included the directives from Baylor that Dr. Leach no longer supervise Baylor residents at the VA.  Dr. Leach was "surprised, upset, offended, embarrassed, publicly humiliated, and professionally compromised" because the information had been accessible to VA staff for several months.  (*Id.*).

Dr. Berger investigated and determined that access to this file was not VA-wide, as Dr. Leach had stated.  Instead, access was limited to 38 people in the Urology Department.  Although Dr. Berger recognized that even such limited opportunity for access was improper, he believed that very few individuals had actually accessed the "Leach" file.  (*Id.*).  All VA Medical Center

19

employees are required to sign an information security agreement that prohibits opening a file, even

on a shared drive, without permission of the owner or creator of the file.  Dr. Berger told Dr. Leach

that he had admonished Dr. Griffith, who had since taken steps to prevent a reoccurrence.  (*Id.*).

On March 6, 2006, Dr. Griffith again asked Dr. Leach to change his tour of duty at the VA.

He told Dr. Leach that because the VA Medical Center "is one of Baylor College of Medicine's

primary teaching hospitals, and because you are no longer affiliated with Baylor, Baylor has directed

that you be disassociated from the urology residency, medical student training, and the urology

clinic and operating room [at the VA]."  (Docket Entry No. 39, Ex. 85).  Dr. Griffith stated that

although the "Baylor mandate effectively eliminate[d] [him] from participation in urological

surgery" at the VA, there were a number of areas in which his "medical and administrative

expertise" could be used at the VA.  (*Id.*).  These included developing patient and provider education

resources, clinical practice guidelines, CPRS templates, and other academic resources, as well as

reviewing and executing a number of administrative tasks in the Urology Service.  (*Id.*).  Dr. Griffith

told Dr. Leach that Keith Neeley had approved these changes and would be available to meet with

Dr. Leach to discuss a timeline for implementing them.

On April 18, 2006, Dr. Berger and Keith Neeley met with Dr. Leach and his attorney to

discuss expectations for Dr. Leach's future at the VA.  Dr. Berger gave Dr. Leach a memo at this

meeting outlining several areas in which Dr. Griffith had suggested Dr. Leach was not meeting

expectations.  The memo stated that Dr. Griffith would give Dr. Leach a performance plan to cover

Dr. Leach's post-Baylor responsibilities at the VA.  Dr. Berger warned Dr. Leach that failing to

comply with the performance plan could result in disciplinary action, including termination from

the VA.  Dr. Leach responded to Dr. Berger's memo on April 21, 2006.  (Docket Entry No. 39, Ex. 104).  He stated that he "look[ed] forward to Dr. Griffith's performance plan but [found] it strange that a performance plan was previously drafted in January 2006 executed and stored in the 'Leach file' without benefit of discussion with me or distribution to me."  (*Id.*).

Dr. Griffith reissued a performance improvement plan for Dr. Leach in June 2006.  In the plan, Dr. Griffith stated that his "vision for the urology service [was] to develop a unified service such that all providers offer patients the same care using '[VA Medical Center] Urology Service Guidelines.'. . . Similarly, patients will be broadly educated about specific urological problems before, during, and after clinic visits."  (Docket Entry No. 39, Ex. 94).  Dr. Griffith asked Dr. Leach to "become a partner in developing and implementing these initiatives."  (*Id.*).  The performance plan assigned Dr. Leach to "cover" or "pinch-hit" for absent or delayed doctors in the urology clinic and to create and staff new "group clinics" for specific urological conditions.  (*Id.*).  Dr. Leach responded to this performance and improvement plan in a memo dated June 6, 2006.  He stated that the clinical guidelines "may put our veteran patients at unnecessary risk" and that the patient educational materials "may be impractical, potentially dangerous and may not achieve the desired goals."  (*Id.*, Ex. 52).  With respect to the other assignments, Dr. Leach stated that the "timeline for completing these elements is unrealistic."  (*Id.*).  Dr. Leach rewrote the performance and improvement plan and sent it to Dr. Griffith.

As of August 3, 2006, Dr. Griffith had not noticed any progress by Dr. Leach on the assignments made in June 2006.  According to Dr. Griffith, Dr. Leach "made token, if any, gesture[s]" to develop the clinical guidelines and patient educational materials.  (Docket Entry No. 39, Ex. 55, Griffith Affidavit, at 22:8-12).  Dr. Griffith asked the Labor Relations Specialist, Phyllis

Isiminger, for assistance on how to proceed.  Dr. Griffith told Isiminger that Dr. Leach "is not involved with the VA patients, VA activities, nor any of the assignments made to him in writing on 6/9/2006." (*Id.*, Ex. 93).  Dr. Griffith stated that Dr. Leach's review of some consult delinquencies was "the only VA activity" that he was "contributing to the VA mission." (*Id.*).  Isiminger suggested that Dr. Griffith issue Dr. Leach a written counseling memorandum outlining the deficiencies in his performance and give Dr. Leach 60 days to improve.  (*Id.*).

On August 7, 2006, Dr. Griffith gave Dr. Leach a written counseling memorandum.  (Docket Entry No. 39, Ex. 94).  Dr. Griffith said that although Dr. Leach no longer had any "clinic time" or responsibilities to take up his time, he had failed to meet most of the deadlines for the assignments made in the performance improvement plan.  According to Dr. Griffith, Dr. Leach had asked few questions about the assignments, had not completed or had made insufficient progress on most of the assignments, had not produced any patient education documents, and had not provided any educational materials to the patient waiting rooms.  (*Id.*).  Dr. Griffith did receive nine separate sheets of guidelines from Dr. Leach with bullet points relating to urology.  Dr. Griffith described these as "textbook kind of things" that a medical student could produce from a standard text.  Dr. Griffith did not feel that the clinical guidelines Dr. Leach submitted were compatible with his intellect or expertise or that they were comparable to similar types of documents available from the American Urological Association.  Dr. Griffith asked Dr. Leach to "take immediate steps to bring [his] performance to a satisfactory level."  (*Id.*).

Dr. Griffith and Dr. Berger met with Dr. Leach in September 2006 to discuss the June 2006 performance improvement plan.  Dr. Berger gave Dr. Leach a December 31, 2006 deadline to complete his assignments.  According to Dr. Griffith, this was more than enough time.  Dr. Leach

asserts that he did not have enough time to complete the assignments because he was doing consult delinquencies, cancer coding delinquencies, and compensation and pension examinations.  Dr. Griffith asserts that Dr. Leach took these administrative assignments, which were only supposed to be one part of his post-Baylor responsibilities, and made them into a full-time job, spending nearly all his 35 working hours each week on them.  (Docket Entry No. 39 Ex. 55, Griffith Affidavit, at 27:1-28:5).

On November 15, 2006, Dr. Scheurich, Dr. Berger, Dr. Griffith, and Dr. Boone met to discuss Dr. Leach's VA employment.  At that meeting, they developed a "working plan."  Under the plan, if Dr. Leach did not complete the tasks assigned in his performance plan by December 31, 2006, the VA would terminate his employment.

On January 19, 2007, Dr. Griffith evaluated Dr. Leach's performance for the one-year period ending September 30, 2006.  (Docket Entry No. 39, Ex. 53).  In the evaluation, Dr. Griffith stated that "Dr. Leach is well trained and is a competent clinical urologist" and has satisfactorily reviewed "compensation and pension evaluations, and consult, encounter and TNM Cancer coding delinquencies."  (*Id.*).  Dr. Leach, however, had not satisfactorily completed the patient education or clinical guidelines assignments or the "pinch hitting" assignments.  Dr. Leach had not created or staffed new group clinics.  Dr. Griffith rated Dr. Leach's performance as unsatisfactory.  (*Id.*).  After reviewing Dr. Griffith's evaluation, Dr. Berger recommended to Dr. Scheurich, Deputy Chief of Staff, that Dr. Leach's employment at the VA be terminated.   Dr. Scheurich approved the termination letter, which was prepared by the Human Resources Department, based on Dr. Berger's recommendation and the unsatisfactory performance evaluation.  The Director of the VA Medical Center, Edgar Tucker, signed Dr. Leach's official termination letter on January 29, 2007.  (*Id.*, Ex.

23

54).  This lawsuit against Baylor followed.  (Docket Entry No. 1).

Although Dr. Leach was originally represented by counsel, he is now proceeding *pro se*. Courts apply "less stringent standards to parties proceeding *pro se* than to parties represented by counsel and liberally construe the briefs of *pro se* litigants." *Sanders v. Barnhart*, 105 Fed. Appx. 535, 536 (5th Cir. 2004) (citing *Grant v. Cuellari*, 59 F.3d 523, 524 (5th Cir. 1995); *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993)).

## II.    The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,  477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000).  The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See id.*  The nonmovant must

"do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.

## III.    The Race Discrimination Claim

Dr. Leach argues that Baylor discriminated against him based on his race because during his employment with Baylor, he was the only Baylor faculty member expected to devote 35 or more hours per week at the VA Medical Center, develop a clinical practice, and obtain research funding. Dr. Leach also argues that Baylor terminated his contract based on race. He points to the "Michael Jackson" comment by Dr. Boone as direct evidence of racial discrimination and argues that Baylor's hiring of Dr. Link , who is Caucasian, to replace him is circumstantial evidence.

### A.    The Legal Standard Under Title VII

Title VII prohibits discrimination by employers "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a). Intentional discrimination can be proven by either direct or circumstantial evidence. *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir. 2000). Evidence is "direct" if it would prove the fact in question without inference or presumption. *Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409, 415 (5th Cir. 2003)

25

(citations omitted).  If no direct evidence exists, the court uses the familiar burden-shifting framework created by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).   Under *McDonnell Douglas,* a plaintiff alleging discrimination must first make a *prima facie* showing that: (1) she is a member of a protected class; (2) she was qualified for the position; and (3) others similarly situated were treated more favorably. *See id.*; *Septimus v. Univ. of Houston,* 399 F.3d 601, 609 (5th Cir. 2005).  If the plaintiff makes the *prima facie* showing, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the challenged action.  *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.  If the defendant meets this burden, the plaintiff must then create a genuine issue of material fact that: (1) the defendant's reason is not true, but is instead a pretext for discrimination; or (2) the defendant's reason, while true, is only one of the reasons for its conduct and that discrimination was a motivating factor in the defendant's decision.  *See Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004); *see generally, Crawford v. U.S. Dept. of Homeland Sec.*, 245 Fed. App'x 369, 377-78 (5th Cir. 2007).  The plaintiff  can meet this burden "by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's nondiscriminatory reasons are merely pretext for discrimination." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005).  The United States Supreme Court, in *Reeves v. Sanderson Plumbing Prods.,* stated that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."  530 U.S. 133, 143 (2000). A plaintiff may show pretext by demonstrating that the proffered reasons for the challenged employment action are false or "unworthy of credence."  *Laxton v. Gap Inc*., 333 F.3d 572, 578 (5th Cir. 2003); *Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002) (an employer's

inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual).  If the plaintiff can show that the proffered explanation is merely pretextual, that showing, when coupled with the *prima facie* case, will usually be sufficient to survive summary judgment.  *Reeves*, 530 U.S. at 146-48.

In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus.  *Rachid*, 376 F.3d at 312.  The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated on the basis of the plaintiff's membership in the protected class.  *Reeves*, 530 U.S. at 143.

### B.    Analysis

### 1.    The Claim Based on Disparate Job Responsibilities

Baylor argues that Dr. Leach's claim that Baylor imposed disparate job responsibilities on him is a challenge to a "discrete discriminatory act" and therefore time-barred.  A Title VII plaintiff must file a charge of discrimination with the EEOC within 300 days of learning of the alleged unlawful employment action.  *See Huckabay v. Moore*, 142 F.3d 233, 238 (5th Cir.1998) (explaining that for states, like Texas, that provide an administrative mechanism to address complaints of employment discrimination, the statutory period is 300 days).  "Each discrete discriminatory act starts a new clock for filing charges alleging that act."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).  An EEOC charge must be filed within the 300-day time period after the discrete discriminatory act occurred.  *Id.* at 113.  "Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Id.; see also Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct.

27

498, 66 L.Ed.2d 431 (1980) (holding that the charging period begins at the time of the discriminatory act and not when the effects of that decision become "most painful").

The Fifth Circuit has identified discrete acts as those that are actionable in themselves, such as termination, failure to promote, denial of transfer, or refusal to hire. *See Newton v. Securitas Security Servs.*, *USA*, *Inc.*, No. 07-10472, 2007 WL 2908651, at *2 (5th Cir. Oct.3, 2007). When a plaintiff asserts a hostile work environment claim that involves acts of harassment that may not be actionable considered separately but contribute to cause a hostile environment over days or even years, the "continuing violation" theory applies. *Morgan*, 536 U.S. at 115 (citing *Harris v. Forklift Sys.*, *Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Under the continuing violation theory, a plaintiff does not have to show that all the offensive conduct occurred within the limitations period. Instead, the plaintiff may show discrimination through a series of related acts if one or more of them falls within the limitations period. *Id.*; *see also Pegram v. Honeywell*, *Inc.*, 361 F.3d 272, 279-80 (5th Cir. 2004). This is because the claim is based on "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117.

Outside the context of a hostile work environment claim, a past discrete discriminatory act that is outside the limitations period cannot be sued upon, even if the prior act has consequences that reach into the limitations period. *See Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618,  127 S. Ct. 2162, 167 L.Ed.2d 982 (2007). In *Ledbetter*, the plaintiff alleged that she had received poor evaluations because her supervisor discriminated against her based upon gender; these poor evaluations resulted in her receiving less pay than she would have absent such evaluations. 127 S. Ct. at 2165-66. She claimed that each paycheck she received gave effect to her supervisor's previous discriminatory acts such that each paycheck was a separate discriminatory employment

28

practice that restarted the charging period.  *Id.*  The Supreme Court rejected Ledbetter's argument. A disparate treatment claim "comprises two elements: an employment practice and discriminatory intent."  *Id.* at 2171.  The Court explained that to raise a timely disparate treatment claim, a plaintiff must demonstrate that the employment practice coincided with the discriminatory intent within the EEOC charging period.  *Id.* at 2172.  The Court observed that Ledbetter did not claim "that intentionally discriminatory conduct occurred during the charging period or that discriminatory decisions occurring before that period were not communicated to her."  *Id.*  The Court "reject[ed] the suggestion that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period."  *Id.*  The Court explained that the "charging period is triggered when a discrete unlawful practice takes place.  A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination."  *Id.*

The *Ledbetter* decision prompted a Congressional response, and on January 28, 2009, the "Lilly Ledbetter Fair Pay Act of 2009" was signed into law.  The Act amends Title VII – specifically 42 U.S.C. § 2000e5(3) –  by adding the following provision:

> [A]n unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

Lilly Ledbetter Fair Pay Act of 2009, Pub.L. No. 111-2, § 3, 123 Stat. 5, 5-6.[2]

The Fair Pay Act of 2009 only affects the *Ledbetter* decision with respect to the timeliness of discriminatory compensation claims. The more general rule announced in *Ledbetter* – that the charging period is triggered when a discrete unlawful practice takes place – reaffirmed the principles set forth in *Ricks*, 449 U.S. at 258, and *Morgan*, 536 U.S. at 113. Courts have applied this rule, as well as the rule that a plaintiff may not sue for a prior discriminatory act outside the charging period based on the continuing effects of that act into the charging period, to other types of discrimination claims not involving compensation. *See*, *e.g.*, *Jackson v. City of Chicago*, 552 F.3d 619, 624 (7th Cir. 2009) (applying *Ledbetter* to a failure to promote claim); *Bennett v. Chatham County Sheriff Dept.*, 2008 WL 4787139, at *7 (11th Cir. Nov. 4, 2008) (applying *Ledbetter* to failure to promote claim). The rule set out in *Ledbetter* and prior cases – that "current effects alone cannot breathe new life into prior uncharged discrimination" – is still binding law for Title VII disparate treatment cases involving discrete acts other than pay.

To determine whether Dr. Leach's disparate job responsibilities claim is timely, this court must "identify precisely the 'unlawful employment practice' of which he complains." *Ricks*, 449 U.S. at 258. Dr. Leach complains of disparate job responsibilities, not a hostile work environment. Baylor argues that the trigger to start the charging period is the January 29, 2002 offer letter in which Dr. Boone described Dr. Leach's job responsibilities. The letter stated that Dr. Boone expected Dr. Leach's initial term to focus on getting the VA clinic in top shape, in addition to developing a clinical

---

[2] The Act also amends the Age Discrimination in Employment Act, the Americans With Disabilities Act, and the Rehabilitation Act of 1973. See Lilly Ledbetter Fair Pay Act of 2009, Pub.L. No. 111-2, § 3, 123 Stat. 5, 6-7.

practice and obtaining funding for his research.  Dr. Leach first complained about the unfavorable treatment or higher expectations in his EEOC discrimination charge, which he filed on November 7, 2005, far more than 300 days after he learned about his job responsibilities in the offer letter.  If the offer letter is the trigger, then under *Morgan* and *Ledbetter*, Dr. Leach's claim is not made timely because the effects of the allegedly discriminatory decision to offer him those responsibilities continued into the charging period.

Dr. Leach, however, does not complain about the assignments set forth in his offer letter *per se*, but that Dr. Boone and Baylor imposed those responsibilities disparately upon Dr. Leach compared to white Assistant Professors.  Although the Supreme Court in *Ledbetter* "declined to address whether Title VII suits are amenable to a discovery rule," the Fifth Circuit has held that "the operative date from which the limitations period begins to run is the date of notice of the adverse action."  *Hartz v. Administrators of Tulane Educational Fund*, 275 Fed. App'x 281, 287 (5th Cir. 2008) (citing *Ricks*, 449 U.S. at 258 ("the proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful")).  It is unclear from the record before this court whether Dr. Leach had notice of the disparate job responsibilities more than 300 days before he filed his EEOC discrimination charge.

It is unnecessary to determine whether Dr. Leach's claim is time-barred because even if it is not, Dr. Leach cannot establish a *prima facie* case of discrimination based on disparate job responsibilities.  To establish a *prima facie* case of discrimination based on disparate job treatment, Dr. Leach must show that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) that he suffered an adverse employment action; and (4) that he was treated less favorably than other, similarly situated coworkers outside the protected class. *McCoy v. City of Shreveport*, 492

F.3d 551, 556 (5th Cir. 2007) (per curiam).

Dr. Leach has not made the necessary showing of an adverse employment action.  In the Fifth Circuit, an adverse employment action in a discrimination suit under Title VII must be an "ultimate employment decision" such as hiring, discharging, promoting, compensating, or granting leave. *McCoy*, 492 F.3d at 560.  The Fifth Circuit explicitly held in *McCoy* that its "precedent recognizing only 'ultimate employment decisions' as actionable adverse employment actions remains controlling for Title VII *discrimination* claims." *McCoy,* 492 F.3d at 560.  *McCoy* held that, although the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006), altered the Fifth Circuit's "adverse employment action" standard in the context of *retaliation* claims, it did not affect the standard in the context of *discrimination* claims. *McCoy,* 492 F.3d at 559-60.  A plaintiff must show that he was subject to an ultimate employment decision, such as "hiring, granting leave, discharging, promoting, or compensating," to establish a *prima facie* case of discrimination under Title VII.  *Id.* at 559; *see also Pegram v. Honeywell, Inc.,* 361 F.3d 272, 282 (5th Cir. 2004).

The cases make clear that imposing a higher workload on an employee than on his coworkers is not an ultimate employment decision.  *See Hart v. Life Care Ctr. of Plano*, 243 Fed. App'x 816, 818 (5th Cir. 2007) (plaintiff who was assigned more difficult tasks than Hispanic coworkers did not suffer an adverse employment action); *Benningfield v. City of Houston,* 157 F.3d 369, 376-77 (5th Cir. 1998) (holding that being assigned an unusually heavy work load is merely administrative matter and not an adverse employment action); *Wesley v. Yellow Transp., Inc*., 2008 WL 5220562, at *2 (N.D. Tex. Dec. 12, 2008); *see also Grimsley v. Marshalls of MA, Inc.*, 284 Fed. App'x 604, 609 (11th Cir. 2008) (employee did not suffer adverse employment action when supervisor increased

workload, assigned him additional tasks and denied him breaks while allowing employees outside of protected class to take breaks); *Fane v. Locke Reynolds*, *LLP*, 480 F.3d 534, 539 (7th Cir. 2007) ("the mere fact that an employee . . . had a heavier workload than her co-workers does not amount to an adverse employment action"); *but see Feingold v. New York*, 366 F.3d 138, 152-53 (2d Cir. 2004) (the assignment of an excessive and disproportionately heavy workload was an adverse employment action); *Hubbard v. Port Auth. of New York and New Jersey*, 2008 WL 464694, at *11 (S.D.N.Y. Feb. 20, 2008) (distinguishing *Feingold* as limited to situations in which excessively disproportionate hours had "negative ramifications for the plaintiff's job conditions" and holding that "allegations of excessive or unfair work assignments, without more, do not amount to 'adverse employment actions'").

Moreover, Dr. Leach has not presented or identified evidence in the summary judgment record that similarly situated, white Assistant Professors at Baylor were treated differently.  The evidence in the record shows that not all Assistant Professors were required to work at the VA but had a variety of different obligations in research or clinical practice.  Dr. Leach was offered the position at Baylor with the focus on getting the VA clinic in "top shape."  Dr. Leach's unsubstantiated assertion that similarly situated white Assistant Professors were not required to maintain a similar workload, perform research, and obtain funding is insufficient to survive summary judgment on this claim.  *See Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002) (noting that conclusory allegations and unsubstantiated assertions are insufficient to overcome summary judgment).

Baylor's motion for summary judgment on Dr. Leach's discrimination claim based on disparate job responsibilities is granted.

33

### 2.      The Job Termination Claim

#### a.      Direct Evidence of Discrimination

Dr. Leach points to his own testimony that Dr. Boone told him that private hospitals at the Houston Medical Center would be unlikely to offer "black boys" an endowed chair unless they did a "Michael Jackson type transformation." Dr. Leach argues that this comment is direct evidence of Baylor's racial discrimination.

To be probative of an employer's discriminatory intent, a workplace comment must be "direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [race] was an impermissible factor in the decision to terminate the employee." *See Equal Employment Opportunity Comm'n v. Texas Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996); *Sandstad v. CB Richard Ellis*, *Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) ("Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.").

In *Jones v. Overnite Transp. Co.*, 212 Fed. App'x 268, 273 (5th Cir. 2006), the court held that racially biased comments were not direct evidence of discrimination. The plaintiff, a dock worker at a transportation company, allegedly overheard a supervisor state that he wanted to "get rid of all the blacks" and "fire a bunch of niggers." *Id.* The plaintiff's employment was terminated a few months after these comments. *Id.* The court held that although these comments revealed the supervisor's discriminatory animus, they "lack[ed] the indicia of specificity and causation required to be direct evidence of race discrimination." *Id.* The court also considered evidence that the same supervisor had requested a staffing agency to send white drivers instead of black drivers. *Id.* The court held that this statement was not direct evidence of discrimination because it did not relate to the plaintiff's former employment as a dock worker and required the trier of fact to infer a nexus

between the statement and plaintiff's termination. *Id.*; s*ee also Haas v. ADVO Sys.*, *Inc.*, 168 F.3d 732, 733 (5th Cir. 1999) (holding that a job interviewer's statement that the plaintiff's age caused him "concern" was not direct evidence of age discrimination in the employer's decision not to hire plaintiff because an additional inference of discrimination was required).

By contrast, in *Jones v. Robinson Prop. Group*, *L.P.*, 427 F.3d 987 (5th Cir. 2005), the court found racially biased comments to be direct evidence of race discrimination. In that case, an African-American applicant was not hired for the position of casino poker dealer. Several witnesses testified that the decisionmakers for the casino's poker room were "using race as a factor in employment decisions." *Id.* at 993. The decisionmakers made comments to witnesses that "these good old white boys don't want black people touching their cards," and "maybe I've been told not to hire too many blacks in the poker room." *Id.* at 990-91. Because these race-based comments related directly to the decision whether to hire African-Americans, the court concluded that the comments were direct evidence of the plaintiff's claim. *Id.*; *see also Cross v. FPP Operating Partners*, 2001 WL 1143159, at *7 (N.D. Tex. Sep. 25, 2001) (supervisor's comment allegedly made to white subordinate employees that "no fucking niggers were going to work in her store, especially niggers from Electra" was direct evidence of discrimination); *Bowe v. Exide Corp.*, 2001 WL 705881, at *3 n. 1 (N.D. Tex. June 18, 2001) ("[Direct] evidence typically involves statements made by the employer or certain of its personnel that indicate that an employment decision was based on a forbidden factor.").

Applying these precedents to the present case leads to the conclusion that Dr. Boone's alleged comment is not direct evidence of race discrimination. Dr. Boone's comment "require[s] the trier of fact to infer a nexus between the evidence and [Dr. Leach's] termination." *See Overnite Transp. Co.*, 212 Fed. App'x at 273. Dr. Boone did not state that Dr. Leach's employment would be terminated

because of his race.  Dr. Leach alleges that Dr. Boone said that private hospitals in the Houston Medical Center would be unlikely to offer "black boys" an endowed chair without a "Michael Jackson type transformation."  Dr. Boone's comment is not sufficiently specific or unambiguous to allow the trier of fact to conclude without inference or presumption that Dr. Boone had a racial animus that was a basis for the decision not to renew Dr. Leach's contract.  Dr. Boone's alleged comment is appropriately analyzed under the framework for circumstantial evidence.

### b.        Circumstantial Evidence of Discrimination

Baylor does not dispute that Dr. Leach is a member of a protected class or that he was qualified for the position.  Baylor argues that Dr. Leach cannot show that other similarly situated faculty members were treated more favorably.  Dr. Leach asserts that Baylor replaced him in the Urology Department with Dr. Link, who is white, in July 2005.  Dr. Leach also argues that white Assistant Professors in the Urology Department "of similar tenure" had their employment contracts renewed when his was not.  According to Dr. Leach, these Baylor faculty members are Dr. Chris Smith, Dr. Lawrence Cisek, and Dr. Eric Jones.

The record does not show that Baylor hired Dr. Link to replace Dr. Leach.  The decision to hire Dr. Link was made before the decision not to renew Dr. Leach's contract.  Dr. Link did not assume all of Dr. Leach's job responsibilities.  Dr. Link did not take a position at the VA.  His clinical responsibilities in the Urology Department at Baylor were different from Dr. Leach's because he practiced in a different specialty.  Dr. Leach was not "replaced" by Dr. Link.  *See Wisdom v. M.A. Hanna Co.*, 978 F.Supp. 1471, (N.D. Ga. 1997) (holding that employee was not replaced by individual outside protected class because although some of their duties were parallel, the nature of their positions and duties were different).

36

Assuming that Dr. Leach had made a *prima facie* showing of racial discrimination in the decision not to renew his contract, Baylor has offered a legitimate nondiscriminatory reason for its decision. Dr. Boone has stated that he decided not to renew Dr. Leach's contract because Dr. Leach did not meet Baylor's expectations for funding and publications during his initial contract three-year term and Dr. Leach did not provide Baylor with the information it requested in January 2005.

A plaintiff may create a fact issue by providing or identifying evidence that he was "clearly better qualified" than the employee chosen for the position, not merely "similarly qualified." *Sabzevari v. Reliable Life Ins. Co.*, 264 Fed. App'x 392, 395 (5th Cir. 2008); *see also Manning v. Chevron Chem. Co.*, 332 F.3d 874, 882 (5th Cir. 2003); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356–57 (5th Cir. 2001). "However, the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Celestine*, 266 F.3d at 357 (*quoting Deines v. Tex. Dept. of Prot. & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999)). Evidence that a plaintiff was "clearly better qualified" than the employee chosen for the position "must be more than merely subjective and speculative." *Eberle v. Gonzales*, 240 Fed. App'x 622, 630 (5th Cir. 2007) (quoting *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996)).

The Supreme Court has recognized that evidence of a plaintiff's superior qualifications may establish pretext "in some circumstances." *Ash v. Tyson Foods, Inc*., 546 U.S. 454, 456-57, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006) (per curiam). The Court noted that several circuits find an inference of pretext only if "the disparity in qualifications is so apparent as virtually to jump off the page and

slap you in the face." *Id.*  The Court rejected this standard but declined to "define more precisely what standard should govern pretext claims based on superior qualifications." *Id.* at 458.  The "clearly better qualified" standard set forth by the Fifth Circuit is not similar to the standard the Court found faulty in *Ash*.  *See, e.g., Celestine*, 266 F.3d at 357; *Manning*, 332 F.3d at 882; *see also Bright v. GB Bioscience*, *Inc.*, 2008 WL 5210657, at *7 n.8 (5th Cir. Dec. 15, 2008) (recognizing that although *Ash* disapproved of the "jumping off the page" standard as "unhelpful and imprecise," the Fifth Circuit's more precise definition of the comparative qualifications standard set forth in *Deines* is good law); *Gillaspy v. Dallas Indep. Sch. Dist.*, 278 Fed. App'x 307, 313-14 (5th Cir. 2008) ("We are confident that [our "clearly better qualified"] standard comports with the directive in *Ash* to formulate a better standard  [than "slap in the face"] to govern pretext claims based on superior qualifications."); *Burrell v. Dr. Pepper/Seven Up Bottling Group*, *Inc.*, 482 F.3d 408, 412 (5th Cir. 2007) (recognizing, post-*Ash*, that a plaintiff may prove pretext by showing that he was "clearly better qualified" than the person selected for the position); *Runnels v. Texas Childrens Hospital Select Plan*, 167 Fed. App'x 377, 383 (5th Cir. 2007) (applying the "clearly better qualified" standard, post-*Ash*).

In *Gillaspy*, the court found that the plaintiff produced sufficient evidence to raise a fact issue as to whether she was "clearly better qualified" for the position.  278 Fed. App'x at 314.  Gillaspy was a twenty-year employee of the Dallas Independent School District's Custodial Services Department.  *Id.* at 308.  After various promotions, she became a "Field Supervisor" responsible for supervising several campuses and over 200 employees.  *Id.*  When the District outsourced her department to a private company, her position was eliminated and two new positions, Area Custodial Supervisor (ACS) and Facility Supervisor, were created.  The ACS position closely resembled the

Field Supervisor position.  *Id.* at 309.  Gillaspy, along with four other Field Supervisors who were all male, applied for one of eight ACS positions.  The District conducted interviews and scored applicants based on certain criteria.  All eight positions were filled with male applicants.  Gillaspy was the only former Field Supervisor not selected.  *Id.*  She alleged sex discrimination.  The District cited her low interview score and the interviewers's belief that she lacked the necessary management skills for the ACS position.  *Id.*  To show pretext, Gillaspy offered evidence that during her twenty years with the District she had "received a satisfactory rating or higher on all performance reviews, including two 'performing above expectations' reviews, and one 'clearly outstanding' review."  *Id.* at 314.  She had worked in supervisory positions for ten years, the last three as Field Supervisor.  That position and the ACS position were nearly identical.  Moreover, some of the men hired for the ACS position did not meet the District's minimum education and experience requirements.  *Id.*  The court held that Gillaspy had presented sufficient evidence to raise a fact issue on pretext.  *Id.; see also Conner v. Hoeschst Celanese Chemical*, *Inc.*, 211 Fed. App'x 257, 261 (5th Cir. 2007) (finding evidence that plaintiff was "clearly better qualified" because she had been trained specifically for many of duties involved in the newly created laboratory position, the employee chosen had to receive special training after selected, and the training coordinator said that the plaintiff was more qualified for the position).

By contrast, the plaintiff in *Amie v. El Paso Indep. Sch. Dist.*, 253 Fed. App'x 447 (5th Cir. 2007), did not show that he was "clearly better qualified" than the person selected for the position.  Amie, who was African-American, worked as a teacher and basketball coach at both the middle and high school levels and had several years of head-coaching experience.  *Id.* at 449.  In September 2005, Amie applied for a position as the head varsity basketball coach for another high school.  *Id.*

The school interviewed several teacher-candidates who had some form of basketball coaching experience and chose Morales, who was Hispanic. *Id.* Amie alleged race discrimination. The school responded that it chose the best person to ensure that student athletes did well in the classroom and on the basketball court. *Id.* at 450. At the time, the school's student athletes were performing poorly in reading and math and had a high dropout rate. *Id.* Amie attempted to rebut this nondiscriminatory reason as pretextual by arguing that he was clearly more qualified than Morales. *Id.* at 453. The court rejected this argument, concluding that "an independent review of their respective resumes does not clearly indicate that Amie is the better qualified candidate." *Id.* at 454. Although Morales had never been a head coach, he did have both high school and college coaching experience and had recently helped his middle school team achieve a successful season. Amie had not coached basketball in eight years. Morales had a Masters Degree in Physical Education, whereas Amie only had a Bachelors Degree in Secondary Education. The court held that Amie failed to raise a fact issue as to whether the school's reason for hiring Morales was a pretext for unlawful discrimination. *Id.*; *see also Eberle*, 240 Fed. App'x at 630 (finding that plaintiff who was passed over for promotion failed to establish pretext; the plaintiff had worked for the employer longer, taken many training courses, received several awards, and scored higher on a merit promotion ranking form than the person selected, but "greater experience alone will not suffice to raise a fact issue on whether one person is clearly more qualified than another" and the merit scores were only used to place candidates on a list from which the supervisor was free to choose the best person for the job).

The question of comparative qualifications is particularly complicated in cases involving academic promotion. A court must refrain from substituting its judgment about a professor's qualifications for those of professional scholars, who "are in the best position to make the highly

subjective judgments related with the review of scholarship and university service." *Farrell v. Butler University*, 421 F.3d 609, 616 (7th Cir. 2005); *see also Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984); *Dobbs-Weinstein v. Vanderbilt University*, 1 F.Supp.2d 783, 795 (M.D.Tenn. 1998). "[P]eer judgments as to departmental needs, collegial relationships and individual merit may not be disregarded absent evidence that they are a facade for discrimination." *Gottlieb v. Tulane Univ. of Louisiana*, 809 F.2d 278, 283 n.6 (5th Cir. 1987) (quoting *Zahorik*, 729 F.2d at 93)).  Because "professors are individuals and perform different roles within a department, it is difficult to compare the reasons for promoting one faculty member with the reasons for promoting or not promoting another." *Guseh v. North Carolina Cent. University*, 423 F.Supp.2d 550, 559 (M.D.N.C. 2005) (quoting *Smith v. University of North Carolina*, 632 F.2d 316, 345 (4th Cir.1980)).  Although the subjective nature of these determinations "makes proof of the basic qualifications [that would merit promotion] more difficult, it, nevertheless, may be accomplished, for example, by comparing the qualifications of those individuals who were promoted recently." *Id.*

Dr. Leach points to the fact that three white doctors had their contracts renewed when he did not.  But the record does not support an inference of racial discrimination.  Dr. Leach does not argue, nor has he presented evidence, that he was "clearly better qualified" than Drs. Smith, Cisek, or Jones. No inference of pretext or discriminatory motive arises if the differences in qualifications are not "so widely disparate that no reasonable employer would have made the same decision." *Deines*, 164 F.3d at 282; *see also Odom v. Frank*, 3 F.3d 839, 846 (5th Cir. 1993) (a showing that two candidates are similarly qualified does not show pretext under this standard).

Dr. Leach's assertion that he was better qualified in terms of publications, funding, or research does not raise a fact issue.  A professor's assertion or belief that he was better qualified than the

41

person selected for the position is insufficient to create a fact issue on pretext. *See*, *e.g.*, *Ward v. Midwestern State Univ.*, 217 Fed. App'x 325, 328-29 (5th Cir. 2007) (finding that professor's deposition testimony that he was "better qualified and better published than his colleague" was "mere speculation" and insufficient to raise a fact issue on better qualifications as evidence of pretext); *Escobar v. Univ. of North Texas*, 562 F.Supp.2d 804, 811 (E.D. Tex. 2007) (finding that a professor's "subjective belief . . . in her affidavit that she was better qualified than the professors who were not terminated" was insufficient to defeat summary judgment); *Kulkarni v. City Univ. of New York*, 2002 WL 31886639, at *8 (S.D.N.Y. Dec. 27, 2002) (finding that university professor failed to rebut nondiscriminatory reason for his nonappointment to endowed chair by asserting that he had published more papers recently than selected candidate; the purpose of the endowed chair was to recruit from outside the university and the selected candidate was a "prominent scholar" whose published work was "momentous in the field").

The evidence in the record showed that Dr. Smith published seventeen peer-reviewed journal articles and received approximately $2,356,729 in grants between July 2002 and July 2005.  Even taking into account Dr. Leach's assertion that Dr. Boone included Dr. Smith on eight of these publications to bolster Dr. Smith's publication numbers, Dr. Leach is not "clearly better qualified" than Dr. Smith with respect to funding and grants.  Dr. Leach obtained $70,000 during his tenure at Baylor, which was part of the SPORE grant, and published five peer-reviewed journal articles between July 2002 and July 2005.  With respect to Drs. Cisek and Jones, there is no evidence in the record that Dr. Leach was "clearly better qualified" than these individuals.  Moreover, the record shows that Drs. Cisek and Jones did not receive seed money for a research program when they began their appointments at Baylor.  There is no evidence that Dr. Smith, Cisek, or Jones failed to meet

expectations with respect to research, grants, or funding.  The record does not show any non-African-American faculty member who did not meet the expectations set forth in his or her offer letter whose contract was renewed.  Dr. Leach has failed to raise a fact issue as to pretext or discriminatory motive based on the comparison of his qualifications with three white doctors whose contracts were renewed.

Dr. Leach argues that Dr. Boone's "black boys" comment raises a fact issue as to pretext or as to whether racial discrimination was a motivating factor in the decision not to renew his contract.  Baylor argues that this comment is a stray remark that does not preclude summary judgment.  Since *Reeves v. Sanderson*, the Fifth Circuit has taken a cautious view of the "stray remarks" doctrine.  *See Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003).  Such remarks "are appropriately taken into account when analyzing the evidence . . . even where the comment is not in the direct context of the termination and even if uttered by one other than the formal decision maker, provided that the individual is in a position to influence the decision."  *Id.*   The Fifth Circuit has continued to apply the so-called *CSC Logic* test, taken from *Brown v. CSC Logic, Inc*., 82 F.3d 651, 655-56 (5th Cir. 1996), after *Reeves*.   Under that test, in analyzing whether a remark is probative of discriminatory intent, a court examines whether the comment related to the protected class of persons of which the plaintiff is a member, proximate in time to the termination, made by an individual with authority over the employment decision at issue; and related to the employment decision at issue.  *See Gillaspy v. Dallas Independent School Dist*., 278 Fed. App'x 307, 313 (5th Cir. 2008); *Jenkins v. Methodist Hospitals of Dallas, Inc.,* 478 F.3d 255 (5th Cir. 2007). But the Fifth Circuit cases are unclear as to whether this test only applies when comments are offered as evidence of direct discrimination as opposed to circumstantial evidence.  *Compare Jenkins*, 478 F.3d at 261-62 (applying four-factor test to evidence of pretext in evaluating a section 1981 claim); *with McLaughlin*

43

*v. W & T Offshore, Inc.*, 78 Fed. Appx. 334, 338-39 (5th Cir. 2003) ("In order to prove pretext in this manner, the statement must: (1) demonstrate a discriminatory motivation, and (2) be made by a person 'primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decision maker.'"); *Laxton v. Gap, Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) ("We continue to apply the *CSC Logic* test when a remark is presented as direct evidence of discrimination apart from the *McDonnell Douglas* framework . . . . [T]he *Russell* court did not apply the *CSC Logic* test to a remark introduced as additional evidence of discrimination."); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000) (holding that workplace remarks sufficed as circumstantial evidence from which inference of discriminatory intent could be drawn even though comments were "stray remarks" under the *CSC Logic* test).

Under the more relaxed test used in *Russell* and *Laxton*, a plaintiff wishing to use workplace remarks as circumstantial evidence of employment discrimination need only show that the remarks demonstrate discriminatory animus on the part of a person who is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decision maker. *Russell*, 235 F.3d at 225*; Laxton*, 333 F.3d at 583; *Sandstad*, 309 F.3d at 899; *see also Phillips v. TXU Corp.*, 194 Fed. App'x 221, 228 (5th Cir. 2006) (holding that "[a] remark is considered probative of discrimination if it demonstrates discriminatory animus and was made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker.").   But even under the more relaxed standard, the remark cannot be the only evidence of pretext.  *Phillips*, 194 Fed. App'x at 228 (citing *Palasota v.Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir. 2003) ("After *Reeves* . . . so longs as remarks are not the only evidence of pretext, they are probative of discriminatory intent")).

44

In the present case, even assuming that the more relaxed test under *Laxton* applies, Dr. Leach cannot raise a fact issue as to pretext or discrimination.[3]  The record shows no other evidence of pretext.  In the absence of other evidence of pretext, Dr. Boone's comment does not preclude summary judgment.  *See Auguster v. Vermillion Parish Sch. Board*, 249 F.3d 400, 405-06 (5th Cir. 2001).

In *Auguster*, the plaintiff, an African-American male who had been a teacher and football coach for many years, was hired to teach sixth grade.  *Id.* at 401.  When he was hired, the school superintendent told the plaintiff that the school had problems with "past black coaches, and if there was another problem, no matter what it was, that he would do his best to get rid of [plaintiff]."  *Id.* at 404.  During the school year, Auguster inappropriately used corporal punishment and showed an R-rated film in class.  *Id.* at 403.  The school gave him a poor evaluation and the school board decided not to renew his contract.  *Id.*  Auguster did not deny that the school had a legitimate reason to terminate his employment, but argued that the reason was a pretext for discrimination.  *Id.*  The court held that in light of the "overwhelming evidence supporting the school board's legitimate

---

[3]It is not clear that the comment, while clearly expressed in an offensive manner, reveals Dr. Boone's own discriminatory animus towards African-Americans or instead reveals his opinion about the discriminatory attitudes of others, specifically, private hospitals in the Medical Center.  The Fifth Circuit has held that for a workplace comment to be evidence of discrimination "the person making the statement must either be expressing his own racial animus, and not someone else's."  *Reilly v. TXU Corp.*, 271 Fed. App'x 375, 379 (5th Cir. 2008).  Dr. Boone's alleged comment that private hospitals in Houston would be unlikely to offer salary guarantees to "black boys" appears to express only his opinion as to the discriminatory animus of private hospitals in Houston.  But taking the evidence in the light most favorable to Dr. Leach, Dr. Boone's alleged use of the term "black boys" may be circumstantial evidence of his own racial bias.  *See Callicutt v. Pepsi Bottling Group*, No. Civ. 00-95DWFAJB, 2002 WL 992757, at *9 (D. Minn. May 13, 2002) ("Without question, the racial epithets of . . . 'blacks,' or 'boy,' qualify as discriminatory comments based on race.").

justification," the superintendent's comments were "no more than stray remarks, insufficient to survive summary judgment." *Id.* at 404. The court held that the alleged comment, without more, could not support an inference that the real reason for the decision not to renew his contract was discrimination. *Id.* at 405; *see also Rubinstein v. Adm'rs of Tulane Ed. Fund*, 218 F.3d 392, 400 (5th Cir. 2002) (holding, in a discrimination case brought by Jewish professor who was denied tenure, that a discriminatory comment "that, if 'the Russian Jew' could obtain tenure, then anyone could" was insufficient, standing alone, to establish pretext). Dr. Boone's alleged "black boys" comment, standing alone, is insufficient to raise a fact issue as to whether Baylor's nondiscriminatory reasons for its decision are pretextual or as to whether race discrimination was a motivating factor.

When, as in this case, the employer proffers and provides summary judgment evidence of a legitimate nondiscriminatory reason for the decision not to renew a contract, and the employee neither identifies nor submits evidence of pretext beyond a remark offered as circumstantial evidence of discrimination, summary judgment is appropriate. Baylor's motion for summary judgment on Dr. Leach's claim that he was terminated based on race discrimination is granted.

## IV.   The Hostile Work Environment Claim

### A.   The Legal Standard

The elements of a racially hostile work environment claim are that: (1) the plaintiff belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known of the harassment, yet failed to take prompt remedial action. *Felton v. Polles,* 315 F.3d 470, 484 (5th Cir. 2002). The fifth element is not required when the alleged harasser is a supervisor with immediate or successively

higher authority over the plaintiff. *See Celestine,* 266 F.3d at 353-54 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

The Supreme Court has explained that in determining whether a workplace constitutes a hostile work environment, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Harris,* 510 U.S. at 23. For harassment to be actionable, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *Watkins v. Texas Dept. of Criminal Justice,* 269 Fed.Appx. 457, 463-464 (5th Cir. 2008).  "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill v. Westward Communications LLC,* 433 F.3d 428, 434 (5th Cir. 2005) (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).  The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

### B.    Analysis

Dr. Leach's hostile work environment claim is based on his March 2004 confrontation with Dr. Lerner and the comments allegedly made by senior Baylor faculty members that Dr. Leach would be "let go" "killed off" "won't survive" or "encouraged to seek employment with another African American faculty member who [had] recently left the department due to the environment the

47

Chairman creates." Dr. Leach also asserts that Dr. Boone's e-mail telling him that "[t]here are many others around that you will conflict with over time" and Dr. Boone's statement that private hospitals in Houston would not give "black boys" salary support unless they did a "Michael Jackson type transformation" are evidence of a hostile work environment. (Docket Entry No. 39, at 15). Baylor argues that the record evidence shows that as a matter of law, the alleged comments and conduct were not sufficiently severe or pervasive to create a hostile work environment.

The comments that Dr. Leach would be "let go" or "killed off" and that many other people at Baylor would conflict with Dr. Leach over time are unrelated to Dr. Leach's race and do not give rise to a hostile work environment claim. *See Vallecillo v. U.S. Dep't of Housing and Urban Dev.*, 155 Fed. App'x 764, 767 (5th Cir. 2005) (affirming summary judgment on a hostile work environment claim when the complained-of harassment was not based on the plaintiff's race or national origin). Moreover, the evidence Dr. Leach presents, taken in the light most favorable to him, does not raise a fact issue as to a hostile work environment. Title VII "was only meant to bar conduct that is so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace." Conduct that "sporadically wounds or offends but does not hinder [an] employee's performance" is not actionable. *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996); *see also Shepard v. Comptroller Public of Accounts*, 168 F.3d 871, 874 (5th Cir. 1999). It is a "demanding" standard that requires proof of severe or pervasive conduct that can be characterized as "extreme." *Faragher*, 524 U.S. at 788.

The case law on when workplace comments give rise to a hostile work environment claim shows a far greater degree of harassment than the record discloses here, both in terms of the frequency and the nature of the offensive communications. *Compare Tademy v. Union Pacific Corp.*,

48

520 F.3d 1149, 1162 (10th Cir. 2008) (finding a fact issue on hostile work environment where various graffiti and cartoons combined with the words "nigger," "nigger go home," and "hang all niggers and jews" were etched on the employee's locker and the employee found a life-sized noose hanging in the workplace); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (finding a hostile work environment was created when a male employee was called "faggot" and "female whore" by coworkers and supervisors weekly and often several times a day); *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 817 (9th Cir. 2002) (finding that a Korean plaintiff suffered harassment when the employer verbally and physically abused the plaintiff every day for nearly four years because of his race); *Walker v. Thompson*, 214 F.3d 615, 619-22 (5th Cir. 2000) (holding that the plaintiff could survive summary judgment based on evidence of years of inflammatory racial epithets, including "nigger" and "little black monkey"); *with Baker v. FedEx Ground Package System*, *Inc.*, 278 Fed. App'x 322, 329 (5th Cir. 2008) (*s*upervisor's comments to African-American employee that "she did not want to work with people like" employee and that "whites rule" were not sufficiently severe to establish a race-based hostile work environment*); Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (holding that a supervisor's infrequent and isolated comments directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not rise to the level of severe or pervasive harassment); *Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (holding that one two-hour "harangue" by a supervisor and use of a mocking tone on one occasion, and another supervisor's comment comparing the plaintiff to a "needy old girlfriend," did not amount to a severe or pervasive working environment); *Elmahdi v. Marriott Hotel Servs.*, *Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (occasional racial comments were insufficient for a hostile work environment claim).

Baylor's motion for summary judgment on Dr. Leach's hostile work environment claim is granted.

## V.     The Retaliation Claim

Dr. Leach alleges that Baylor retaliated against him for filing his EEO complaint by restricting his ability to supervise residents at the VA and by having his tour of duty at the VA changed.  He also alleges that Baylor was involved in the performance plan and evaluation he received at the VA and his termination from the VA, all in retaliation for his EEO complaint against Baylor.

### A.     The Legal Standard

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir.2007); *Septimus v. Univ. of Houston*, 399 F.3d 601, 607-10 (5th Cir.2005).  Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation, which requires a showing that: (1) the plaintiff engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action.  *McCoy*, 492 F.3d at 556-57.  The Supreme Court recently clarified in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), that for purposes of Title VII, an "adverse employment action" is defined differently in the retaliation context than it is in the discrimination context.  *Id.* at 68, 126 S.Ct. 2405.  In the retaliation context,

it is an action that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotations omitted).

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action. *Id.* at 557. If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id.* The standard of proof at the pretext stage requires the plaintiff to show that the adverse employment action would not have occurred but for her protected conduct. *Septimus*, 399 F.3d at 607; *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).

**B.      Analysis**

Baylor does not dispute that Dr. Leach engaged in protected activity by filing an EEO complaint.  Neither does Baylor dispute that Dr. Boone or Dr. Griffith had actual knowledge of Dr. Leach's EEO activity.  Baylor argues that Dr. Leach cannot establish the remaining elements of his *prima facie* case, and that even if he could, it had a legitimate nondiscriminatory reason for its actions and the record does not present a fact issue as to whether that reason was a pretext for discrimination.

**1.      Adverse Employment Action**

Baylor argues that it did not take an adverse employment action against Dr. Leach because the actions he challenges as retaliation were taken by the VA.  Baylor contends that Dr. Griffith, as Chief of Urology at the VA, and Dr. Berger, as Operative Care Line Executive at the VA, restricted Dr. Leach's supervision of residents "in order to remain in compliance with the Affiliation Agreement."  (Docket Entry No. 38, at 25).  Dr. Boone was a staff urologist at the VA.  Baylor

51

contends that neither Dr. Boone nor any Baylor representative played a role in the VA's employment decisions about Dr. Leach.

Dr. Leach argues that Dr. Boone participated in these decisions. He contends that Dr. Boone had "supervisory, management and executive responsibilities with respect to the urology service at the VA" as a result of being Chairman of the Urology Department at Baylor and due to his role in enforcing Baylor policies for urology service at the VA Medical Center. (Docket Entry No. 39, at 4).

In the employment context, the actions of individuals who did not make the challenged decision are typically not actionable. *See, e.g., Gee v. Principi*, 289 F.3d 342, 346 (5th Cir.2002). But the case law recognizes that a decisionmaker can be influenced by others and that influence may be racially biased. Courts use the "cat's paw" approach to analyze such cases.[4] "To invoke the cat's paw analysis, [the plaintiff] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited [retaliatory] animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decision maker.'" *Roberson v. Alltel Information Services*, 373 F.3d 647, 653 (5th Cir. 2004). If the decisionmaker conducted an independent investigation rather than "rubber stamping" or relying on the recommendation of the person with retaliatory animus, any causal link between the alleged retaliatory intent and the adverse employment action is broken. *Mato v. Baldauf*, 267 F.3d 444, 450 (5th Cir. 2001).

Dr. Boone was a staff urologist in the spinal cord injury unit at the VA Medical Center. The

---

[4] A "cat's paw" is defined by Merriam-Webster's Third New International Dictionary 354 (3rd ed.1969) as "[fr. the fable of the monkey that used a cat's paw to draw chestnuts from the fire]: one used by another as a tool: dupe."

spinal cord injury unit is separate from the urology department.  The record does not show that Dr.

Boone had supervisory or management responsibilities or authority at the VA.  Dr. Scheurich testified

that a Baylor department chair has input in, but not authority over, decisions made at the VA Medical

Center. (Docket Entry No. 39, Ex. 56, Scheurich Deposition, at 217:15-218:15).   Dr. Leach's

contention that Dr. Boone exercised management authority at the VA as part of being Urology

Department Chair at Baylor is belied by Dr. Scheurich's testimony and the language of the Affiliation

Agreement.  The Agreement states that Baylor does not have "any legal authority to exercise control

over any VA program or facility" and that "[u]ltimate responsibility for the control and operation of

the VA facilities and programs rests with VA."  (Docket Entry No. 38, Ex. A, Leach Deposition, Ex.

31).  As a department chair, Dr. Boone and other Baylor representatives are required under the

Affiliation Agreement to consult with the VA "in medical school decisions such as planning, program

direction and budgets that may directly affect VA."  (*Id.*).

With respect to the VA's decisions to restrict Dr. Leach's supervision of residents and to

change Dr. Leach's tour of duty, the evidence shows that Baylor requested that Dr. Leach not

supervise Baylor residents based on the Affiliation Agreement and Baylor's potential exposure to

RRC sanction.  In addition, Dr. Boone communicated with Dr. Griffith by e-mail in September 2005

about Dr. Leach's work schedule. Baylor clearly asked the VA not to allow Dr. Leach to supervise

residents at the VA, which, as discussed below, was based on a legitimate nondiscriminatory reason

as to which Dr. Leach has not raised a disputed fact issue.  In addition, there is ample evidence that

the VA independently evaluated Dr. Leach's work schedule and arrangements and made decisions

based on its own assessment of the VA's needs. The VA's independent evaluation breaks any causal

link between Dr. Boone's possible retaliatory intent and the decisions to restrict Dr. Leach's

53

supervision of Baylor residents and change his tour of duty.  *See Bisong v. University of Houston*, 493

F.Supp.2d 896, 914 (S.D. Tex. 2007) (concluding that cat's paw theory did not apply when there was

no evidence that a nonsupervisor influenced the decision to terminate the plaintiff's employment and

there was ample evidence that the actual decisionmaker conducted an independent investigation).

Dr. Leach cannot raise a fact issue as to whether Baylor took an adverse employment action against

him because the decisions to change his work responsibilities at the VA were made by VA

representatives.

    With respect to the VA's performance evaluation of Dr. Leach and decision to terminate his

employment, there is no evidence that the VA was influenced by any recommendation of Dr. Boone

to terminate Dr. Leach.  After Dr. Leach's contract with Baylor was not renewed, Dr. Berger and Dr.

Griffith had multiple meetings with Dr. Leach about his post-Baylor responsibilities at the VA

Medical Center.  Dr. Griffith developed a performance plan that included work assignments that

would not involve supervising Baylor residents.  As his direct supervisor, Dr. Griffith observed Dr.

Leach's performance of these assignments at the VA.  After reviewing Dr. Leach's work at the VA,

Dr. Griffith gave Dr. Leach an unsatisfactory evaluation.  There is no evidence in the record that Dr.

Boone participated in developing the performance plan or in evaluating Dr. Leach's work.  Dr. Boone

was present at the November 2006 meeting with Drs. Berger, Griffith, and Scheurich.  But there is

no evidence that Dr. Boone, or any other Baylor representative, had influence over Dr. Griffith's

January 19, 2007 evaluation of Dr. Leach or Dr. Griffith's recommendation to Dr. Scheurich that the

VA terminate Dr. Leach's employment.

    "[E]vidence of an opportunity to influence does not amount to evidence of actual influence

and [Dr. Leach's] mere speculation about [Dr. Boone's] influence is not enough to demonstrate a

genuine issue of material fact." *Bullington v. United Air Lines*, *Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *overruled on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).  Because there is no evidence that Dr. Boone –  or any other Baylor representative who was not a supervisor on the VA medical staff – influenced the VA's decision to terminate Dr. Leach, the cat's paw theory does not apply.

### 2.    Causal Link

Even if Baylor did take an adverse employment action against Dr. Leach, Baylor argues that there is no causal link between Dr. Leach's protected activity and the decisions about his employment at the VA.  Baylor argues that the temporal proximity of Dr. Leach's EEO charge and the VA's subsequent decisions about his employment, standing alone, is insufficient to create the requisite causal link.  Baylor argues that the lapse of time between Dr. Leach's November 7, 2005 EEO charge and the employment decisions made at the VA in 2006 and 2007 negates an inference of retaliation. Dr. Leach argues that the adverse employment actions at the VA all closely followed his protected activity and notification to Baylor of his protected activity.

The causal link required by the third prong does not rise to the level of a "but for" standard at the *prima facie* case stage. *Gee*, 289 F.3d at 345.  A "causal link" is established when the evidence shows that "the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001).  "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).  The Supreme Court has noted that "cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case

55

uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001). The Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link. *See*, *e.g.*, *Bell v. Bank of Am.*, 171 Fed. App'x 442, 444 (5th Cir. 2006) (holding that a seven-month lapse, by itself, does not support establish a causal link)*; Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002) (holding that a five-month lapse, by itself, does not support an inference of a causal link)*; Harvey v. Stringer*, 113 Fed. App'x 629, 631 (5th Cir. 2004) (finding that a ten-month lapse, by itself, did not create a causal link); *Stroud v. BMC Software*, *Inc.*, 2008 WL 2325639, at *6 (5th Cir. Jun. 6, 2008) (finding that a three-week lapse between protected activity and adverse employment action was sufficient to establish causal link); *Richard v. Cingular Wireless LLC*, 233 Fed.Appx. 334, 338 (5th Cir. 2007) (concluding that two and one half months is a short enough time period to support an inference of a causal link); *Jones v. Robinson Property Group*, *L.P.*, 427 F.3d 987, 995 (5th Cir. 2005) (finding that a period of less than sixty days was sufficiently close to establish causal link for *prima facie* case of retaliation); *Ware v. CLECO Power LLC*, 90 Fed. App'x 705, 708 (5th Cir. 2004) (finding a fifteen-day lapse sufficiently close to support an inference of causation); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (finding that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes") (internal citations omitted); *see also Swanson*, 110 F.3d at 1188 ("Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation").

Dr. Leach filed a preliminary complaint with the TCHR on July 22, 2005 and notified Baylor on August 22, 2005.  On September 13, 2005, Dr. Griffith, after conferring with Dr. Boone, asked

Dr. Leach to change his tour of duty at the VA. On November 1, 2005, Baylor requested that the VA not permit Dr. Leach to supervise Baylor residents.  The temporal proximity between Dr. Leach's protected activity and these actions satisfies the causal link prong of his *prima facie* case of retaliation but, as noted above and discussed further below, the evidence was undisputed that these actions were consistent with the limits imposed by Baylor's role as a medical school and the VA's role as a teaching hospital.  (*See* Part V(B)(1), *supra* at 62; *infra*, Part VI at 74-75).  That a causal link exists between Dr. Leach's protected activity and the tour of duty change and restriction on resident supervision does not affect the outcome because Baylor advanced a legitimate nondiscriminatory reason for this action and Dr. Leach did not raise a fact issue as to pretext.  The significant lapse in time, however, between Dr. Leach's EEO charge against Baylor in 2005 and his January 19, 2007 performance evaluation and January 29, 2007 termination from the VA negates any inference of a causal link.

### 3.    Legitimate Nondiscriminatory Reason and Pretext

Baylor informed the VA that Dr. Leach was no longer a Baylor faculty member and requested that he no longer be permitted to supervise Baylor residents to comply with the Affiliation Agreement and to remain in compliance with the requirements of the RRC of the American Association of Medical Colleges.  The RRC has the power to sanction or terminate postgraduate medical programs that do not meet their requirements for resident supervision.  Baylor's desire to protect the integrity of its resident program is a legitimate nondiscriminatory reason for requesting that Dr. Leach cease supervising residents at the VA.

To raise a fact issue as to pretext, Dr. Leach must identify or present evidence that he would not have been terminated from the VA, or that other adverse employment actions at the VA would

not have occurred, "but for" his discrimination charge against Baylor.  *See Ameen v. Merck & Co.*, *Inc.*, 226 Fed. App'x 363, 377 (5th Cir. 2007).  Dr. Leach argues that Baylor's explanation is a pretext for discrimination because Baylor did not object to non-faculty-member VA staff physicians who supervised Baylor residents at the VA during the period at issue.  In his deposition, Dr. Leach identified Jeff Jones, M.D., Irving Fisherman, M.D., and Herbert Watkins, M.D., as  non-Baylor-faculty on the VA medical staff who were allowed to supervise Baylor residents.  (Docket Entry No. 38, Ex. A, Leach Deposition at 229).  Dr. Leach also asserts that three unidentified neurosurgeons at the VA were allowed to supervise Baylor residents even after the neurosurgeons' affiliation with Baylor ended.  (Docket Entry No. 38, Ex. D, Leach Deposition at 90-91).

The record shows that Dr. Jones, Dr. Fisherman, and Dr. Watkins all held voluntary appointments as Baylor faculty members.  (Docket Entry No. 39, Ex. C, Boone Affidavit at ¶ 18).  As such, they were permitted to supervise Baylor residents at the VA Medical Center.  (*Id.*).  The three neurosurgeons whose Baylor faculty contracts were not renewed were asked to resign from the VA Medical Center.  Dr. Berger testified that these doctors were asked to leave the VA because "they were no longer affiliated with Baylor College of Medicine and we had [Baylor] neurosurgeons capable of performing the work that they had performed."  (Docket Entry No. 39, Ex. E, Berger Affidavit at 15:15-19).  These neurosurgeons all left the VA as of April 2007.  (*Id.*, at 15:3-9).

With respect to the VA's performance evaluation of Dr. Leach and the decision to terminate his employment, the record shows that the VA Medical Center, not Baylor, evaluated Dr. Leach and terminated him based on unsatisfactory performance.  Dr. Leach has not presented nor identified evidence in the summary judgment record raising a fact issue as to whether this reason was a pretext for Baylor's retaliation for Dr. Leach's EEO charge filed much earlier.  The record does not give rise

58

to a disputed fact issue material to determining whether Dr. Leach's tour of duty change, restriction on resident supervision, performance evaluation, and termination were acts of retaliation for his EEO complaint against Baylor.        Baylor's summary judgment motion as to Dr. Leach's retaliation claim is granted.

## VI.    The Tortious Interference Claim

Dr. Leach argues that Baylor tortiously interfered with his employment contract at the VA by convincing the VA to prohibit him from supervising Baylor residents, to change his tour of duty, to change his duties and practice at the VA from surgical and urological to administrative and educational, and to terminate his employment at the VA before the end of his appointed term.  To prevail on this claim, Dr. Leach must establish that (1) he had a valid contract, (2) Baylor willfully and intentionally interfered with the contract, (3) the interference was a proximate cause of his injury, and (4) he incurred actual damages or loss.  *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002) (citing *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996)).  Even if Dr. Leach establishes these elements, Baylor may still prevail by establishing the affirmative defense of justification.  *See Texas Beef Cattle*, 921 S.W.2d at 211.  Justification is an affirmative defense to tortious interference with contract and can be based on the exercise of either one's own legal rights or a good-faith claim to a colorable legal right, even if that claim ultimately proves to be mistaken.  *Prudential Ins. Co. of Am. v. Fin. Review Servs.*, *Inc.*, 29 S.W.3d 74, 80 (Tex. 2000).  If a defendant has a legal right to interfere with a contract, the defendant's motive in interfering is irrelevant.  *Id.* Alternatively, the defendant may not be held liable if the interference occurred in the exercise of a colorable right in good faith.  *Id.*

Baylor argues that Dr. Leach cannot establish the first element of his tortious interference

claim because he did not have an employment contract with the VA. Baylor contends that Dr. Leach had "an appointment, which simply set forth his tour of duty and compensation." (Docket Entry No. 38, at 29). Baylor argues that for an employment contract to exist, the employer must indicate an intent to be bound not to terminate the employee except under certain circumstances. Baylor relies on *Cote v. Rivera*, 894 S.W.2d 536, 542 (Tex. App. – Austin 1995, no writ), for the proposition that a tortious interference claim fails when an at-will employee does not have an employment contract.

Dr. Leach argues that he had an employment contract with the VA and points to the following documents as evidence of that contract: August 9, 2002 Board Action Form;[5] August 11, 2002 Appointment Affidavits;[6] August 11, 2002 Notification of Personnel Action;[7] August 15, 2002 Agreement to Receive Special Pay under 38 U.S.C. 7431;[8] July 11, 2006 Letter of Reappointment/Re-Privileging;[9] March 4, 2005 letter from Dr. Horvath to Dr. Leach referencing a part-time physician agreement;[10] November 29, 2005 letter from Dr. Berger to Dr. Leach regarding a change in Dr. Leach's tour of duty;[11] and a December 6, 2005 Memorandum of Service Level Expectations.[12] Baylor responds that these documents do not constitute a formal agreement that

---

[5] Docket Entry No. 39, Ex. 7.

[6] *Id.*, Ex. 8.

[7] *Id.*, Ex. 9.

[8] *Id.*, Ex. 10.

[9] *Id.*, Ex. 11.

[10] *Id.*, Ex. 47.

[11] *Id.*, Ex. 49.

[12] *Id.*, Ex. 106.

shows an intent to modify the presumption under Texas law that employment is terminable at will.

In Texas, an employment relationship is at-will unless an employment contract limits "in a meaningful and special way" the employer's right to terminate the employee without cause. *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 577-78 (Tex. App.– Houston [1st Dist.] 1992, no pet.). The employer must unequivocally indicate its intent to be bound not to terminate the employee except under specified circumstances.  *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex.1998).  To be enforceable, an agreement to modify the employment-at-will relationship must be express rather than implied and clear and specific.  *See id.* at 502.  In *Lee-Wright*, the court held that the plaintiff's employment was not at-will because a written contract specifying the employee's monthly salary, the dates of employment, and a term of employment of five years limited the employer's right to terminate the employee in a meaningful and special way.  840 S.W.2d at 578. It is unnecessary to determine whether Dr. Leach had an employment contract that rebutted the at-will presumption because such a contract is not required to prevail on a tortious interference claim under Texas law.[13]

---

[13]Dr. Leach has produced several different documents as evidence of an employment contract with the VA.  It is "well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other, and . . . a court may determine, as a matter of law, that multiple documents comprise a written contract."  *Fort Worth I.S.D. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000). These documents show that Dr. Leach was offered an annual salary for a specified term of employment.  The "Board Action" states that on August 11, 2002, Dr. Leach was "credentialed for temporary privileges not to exceed 45 days," but that the VA's Reviewing Board recommended "a permanent, part-time (7/8 FTEE) appointment at the grade and step shown above."  (Docket Entry No. 38, Ex. 7).  The "Notification of Personnel Action" shows that Dr. Leach was to be paid an annual salary of $107,357 while employed at the VA Medical Center.  (*Id.*, Ex. 9).  The "Special Pay Agreement" states that Dr. Leach agreed to

Texas courts have long considered an employment-at-will relationship to be a contract for purposes of a tortious interference claim. *See*, *e.g.*, *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989); *Crouch v. Trinque*, 262 S.W.3d 417, 426 (Tex.App.– Eastland, 2008, no pet.) (concluding that a state university employee's lack of an employment contract was not fatal to her tortious interference claim because an at-will employee may recover for tortious interference with a contract of employment terminable at will); *Armijo v. Mazda Intern.*, 2004 WL 1175335, at *3 (Tex. App. – Houston [14th Dist.] 2004, no pet.) (rejecting the defendant's argument that the plaintiff's tortious interference claim failed because there was no employment contract between plaintiff and employer); *Albertson's Inc. v. Hufnagle*, 2002 WL 1964236, at *4 n.1 (Tex. App. – Dallas 2002, no pet.) ("It is well settled that a cause of action exists for tortious interference with an employment relationship terminable at will."). Baylor's reliance on *Cote* is misplaced. Dr. Leach's employment relationship with the VA satisfies the first requirement of his tortious interference claim.

---

work for the VA in exchange for special pay under VHA regulations "for the period beginning 08-11-02 and ending 08-10-04." (*Id.*, Ex. 10). The agreement, however, states that it "does not constitute an employment contract." (*Id.*). The "Re-Appointment Letter" states that Dr. Leach was re-appointed at the VA Medical Center as active staff in the Urology Department for the period of September 1, 2006 to August 31, 2008. (*Id.*, Ex. 11). There is no language in these documents reserving the right of either party to terminate the contract at will despite the references to an annual salary and definite appointment periods. *Cf. Potrykus v. Abbey Healthcare Group*, *Inc.*, 1996 WL 429304, at *2 (Tex. App. – Dallas, 1996, no pet.) (distinguishing plaintiff's employment contract from that in *Lee-Wright* because although it provided for a definite salary until a specified date, the contract did not rebut the presumption of at-will employment because it also stated that the employer could elect to terminate the plaintiff without cause); *Halsell v. NGC County Mut. Ins. Co.*, 1997 WL 214820, at *2 (Tex. App. – San Antonio 1997, no pet.) (holding that employment contract which provided for a specified salary for a three-year period did not rebut the at-will presumption because the contract also stated that the employer could terminate the employee at will). However, the "Special Pay Agreement" expressly states that it is not an employment contract.

Baylor argues that Dr. Leach cannot establish that Baylor's actions caused him to incur actual loss, and that even if he could, Baylor's actions were justified as an exercise of its legal rights under the Affiliation Agreement with the VA.  Baylor contends that Dr. Leach was not injured by Baylor's alleged actions because he remained employed at the VA for more than a year after Baylor asked the VA to ensure that Dr. Leach did not supervise Baylor residents because he was no longer on the Baylor faculty.  Dr. Leach argues that Baylor's actions caused him injury because after Baylor told the VA that he could not supervise Baylor residents he "was not allowed to work as a urologist at VA medical center and ultimately terminated; [he] received a poor proficiency for inability to provide performances promised; [he] was terminated for poor performance due to inability to function as a urologist."  (Docket Entry No. 39, at 24).  Dr. Leach argues that the Affiliation Agreement did not give Baylor an exclusive right to urology service at the VA and that the Agreement is not "a legally binding document."  (*Id.*).

Dr. Leach cannot recover on his tortious interference claim because the undisputed evidence shows that as a matter of law, Baylor's actions in seeking to  prevent Dr. Leach from supervising Baylor residents at the VA were justified.  Generally, justification is established as a matter of law when the acts alleged as tortious interference are the defendant's exercise of its own contractual rights.  *See Prudential Ins. Co. of America v. Financial Review Service, Inc.*, 29 S.W.3d 74, 81 (Tex. 2000) (concluding that a health insurer was legally justified in  communicating with the insureds about claims against their policies, which a hospital's collections company alleged was tortious interference with contract, because the insurer was only obligated to pay for reasonable charges and had a contractual right to challenge the hospital's bills); *Calvillo v. Gonzalez*, 922 S.W.2d 928, 929 (Tex. 1996) (holding that the defendant's attempt to prevent hospital from contracting with an

63

anesthesiologist that defendant did not approve was legally justified by defendant's exclusive contract to operate and staff the anesthesiology department); *O'Kane v. Coleman*, 2008 WL 2579832, at *10 (Tex. App. – Houston [14th Dist.] 2008, no pet.) (finding, in case involving successive leases, that defendants' alleged interference with plaintiff's lease was justified because it was "based on their own contractual right to occupy the premise"); *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 857 (Tex. App. – Houston [14th Dist.] 2001, pet. denied) (finding actions of an insurance company who gave agency appointments to former officers of independent agency were legally justified because "the insurance companies were not only exercising contractual rights but were endeavoring to discharge their own contractual obligations to third parties").

Under the Affiliation Agreement, Baylor and the VA share responsibilities for the academic enterprise. As part of that enterprise, Baylor has the responsibility to nominate "faculty members to serve as VA medical staff in the number and with the qualifications agreed to by the school and the VA." (Docket Entry No. 38, Ex. A, Leach Deposition, Ex. 31). The Affiliation Agreement states that VA staff members "with faculty appointments are responsible for the supervision of the education of students and house staff on their service, and may only delegate supervision in unusual circumstances to non-faculty staff." (*Id.*). Dr. Boone decided that Dr. Leach's circumstances were not "unusual." (Docket Entry No. 38, Ex. C, Boone Affidavit at ¶ 15). The evidence as to the RRC requirements that faculty supervise residents is undisputed. Baylor exercised its contractual right to have its medical residents supervised only by Baylor faculty when it requested that the VA no longer permit Dr. Leach to supervise Baylor residents. Baylor expressed no opinion on the new work assignments that Dr. Griffith and Dr. Berger developed for Dr. Leach because he could no longer supervise Baylor residents. These actions were consistent with the Affiliation Agreement, under

64

which primary responsibility for medical teaching rested with Baylor and primary responsibility for patient care and administrative matters rested with the VA.  Dr. Leach's unsubstantiated assertion that the Affiliation Agreement is not legally binding does not change the conclusion that Baylor was justified in requesting that Dr. Leach no longer supervise Baylor residents after his contract was not renewed.

Baylor's motion for summary judgment on Dr. Leach's tortious interference with contract claim is granted.

**VII.    Conclusion**

The record does not raise a fact issue material to determining whether Baylor discriminated against Dr. Leach based on his race or whether Baylor tortiously interfered with his employment at the VA Medical Center.  Baylor's motion for summary judgment is granted.  Final judgment is entered by separate order.

SIGNED on February 17, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge